

FILED

2020 DEC -2 PM 3: 44

LEONARD G. HOROWITZ, pro se
5348 Vegas Drive, Suite 353
Las Vegas, NV 89108
Tel: 310-877-3002;
Email: Editor@MedicalVeritas.org

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

LEONARD G. HOROWITZ, an individual.

   Plaintiff

  vs.

PFIZER INC, a corporation; MODERNA, INC, a corporation; HEARST CORPORATION., a business information conglomerate;
HENRY SCHEIN, INC., a corporation; and DOES 1 through 50, inclusive

   Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIV. NO. 2:20-cv-955-FtM-CdeNPM

(FDUTPA; Injunctive Relief; Civil Conspiracy,)

**COMPLAINT FOR INJUNCTIVE RELIEF AGAINST UNFAIR AND DECEPTIVE TRADE BY CIVIL CONSPIRACY IN VIOLATION OF THE FLORIDA PRIVATE WHISTLEBLOWER ACT, CIVIL RIGHTS AND PUBLIC PROTECTION LAWS [15 USC §45; 42 U.S.C. § 1981(3)]; AFFIDAVIT OF LEONARD G. HOROWITZ; SUMMONS.**

**DEMAND FOR JURY TRIAL**

JUDGE: Hon. _____

TRIAL DATE: _____

## TABLE OF CONTENTS

TABLE OF CONTENTS………………………….........................…………..i-ii

I. PRELIMINARY STATEMENT………...........................……………………2

II. JURISDICTION, VENUE AND DEMAND FOR JURY TRIAL…...................…5

III. THE PARTIES AND PERSONA……….........................................…...…........5

A. Plaintiff

  A. LEONARD G. HOROWITZ……….....................................….................5

i

B. Defendants

    a. HENRY SCHEIN, INC. …………................................................…........7

    b. PFIZER INC. ……………...............................................……..........9

    c. MODERNA, INC. …………................................................….........10

    d. HEARST CORPORATION…………................................…...............11

IV. STATUTES OF LIMITATIONS…………...............................…...............12

V. FACTS

    A. Introductory events…………...............................…...............15

    B. Background on censorship, libel, and deceptive trade.........................20

    C. The Conspiracy: Plaintiffs' notice to federal investigators..................27

    D. The Claimed "Safety" and "Efficacy" of Defendants

        PFIZER and MODERNA's "Game Changer" .............................32

        1. The Defective Safety Trial........................................34

        2. False Safety Assurances............................................37

    E. BioPharma and FDA Misapprehended

        Representations..................................................................46

    F. Tortious Interference by Coordinated Censorship Accommodating

        Defendants' Unfair and Deceptive Trade.......................................47

VI. CLAIMS

    COUNT I: Violation of Florida's Deceptive and

        Unfair Trade Practices Act (FDUTPA):

        Making False Claims of "Safety"..................................52

    COUNT II: Violation of Florida's Deceptive and

        Unfair Trade Practices Act (FDUTPA):

        Failure to Disclose Material Connections with Endorsers..............56

        A. Dr. Fauci: A Prime Example.........................................57

COUNT III: Violation of Florida's Deceptive and

Unfair Trade Practices Act (FDUTPA):

Making False Claims of COV-19 Vaccine "Efficacy" ...............61

COUNT IV: Violation of Florida's Deceptive and Unfair Trade

Practices Act (FDUTPA):

Unfair Competition........................................................................63

COUNT V: Tortious Interference with Prospective

Business Advantage.....................................................................68

COUNT VI: Civil Conspiracy to Gain Unjust Enrichment................................74

COUNT VII: Retaliatory Personnel Action (448.102(3)) ..................................79

COUNT VIII: Injunctive Relief .........................................................................81


VII. PRAYER FOR RELIEF...........................................................................................84


AFFIDAVIT OF LEONARD G. HOROWITZ in Support.................................86

*HOROWITZ v. PFIZER INC, MODERNA, INC, et. al..* COMPLAINT FOR INJUNCTIVE
RELIEF AGAINST UNFAIR AND DECEPTIVE TRADE BY CIVIL CONSPIRACY IN
VIOLATION OF THE FLORIDA PRIVATE WHISTLEBLOWER ACT, CIVIL RIGHTS
AND PUBLIC PROTECTION LAWS; Affidavit of Leonard G. Horowitz

LEONARD G. HOROWITZ, pro se
Post Office Box 150457
Cape Coral, FL 33915
Tel: 310-877-3002;
Email: Editor@MedicalVeritas.org

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| LEONARD G. HOROWITZ, an individual. <br>           Plaintiff <br><br> vs. <br><br> PFIZER INC, a corporation; MODERNA, INC, a corporation; HEARST CORPORATION., a business information conglomerate; HENRY SCHEIN, INC., a corporation; and DOES 1 through 50, inclusive <br><br>           Defendants | CIV. NO. _____ <br> (FDUTPA; Injunctive Relief; Civil Conspiracy,) <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF AGAINST UNFAIR AND DECEPTIVE TRADE BY CIVIL CONSPIRACY IN VIOLATION OF THE FLORIDA PRIVATE WHISTLEBLOWER ACT, CIVIL RIGHTS AND PUBLIC PROTECTION LAWS [15 USC §45; 42 U.S.C. § 1981(3)]; AFFIDAVIT OF LEONARD G. HOROWITZ; SUMMONS.** <br><br> **DEMAND FOR JURY TRIAL** <br><br> JUDGE: Hon. _____ <br><br> TRIAL DATE: _____ |

**COMPLAINT FOR INJUNCTIVE RELIEF AGAINST UNFAIR AND DECEPTIVE TRADE BY CIVIL CONSPIRACY IN VIOLATION OF THE FLORIDA PRIVATE WHISTLEBLOWER ACT, CIVIL RIGHTS AND PUBLIC PROTECTION LAWS**

COMES NOW LEONARD G. HOROWITZ (hereafter, "HOROWITZ," or "Plaintiff") filing this Complaint against PFIZER INC. and MODERNA INC. drug/vaccine makers, HENRY SCHEIN, INC. and HEARST CORP., drug distributors and advertisers (altogether hereafter, "Defendants"), seeking permanent injunctive relief and other statutory and equitable relief, restitution, and attorney's fees and costs, from Defendants' alleged violation of The Florida

1

Deceptive and Unfair Trade Practices Act (FDUTPA; Stat. § 501.202, based on 15 USC §45). This Complaint is also authorized by the Florida Private Whistleblower Act (FWA) § 448.102(3); the Defendant's alleged neglect of duty to prevent injuries to the public per 42 USC § 1986; also Section 2000bb of the Religious Freedom Restoration Act as this applies to Title 42 of The Public Health and Welfare law that protects Plaintiff's religious practices and Equal Rights Under the Law (42 USC § 1981(3)); tortious interference with prospective business advantage; and civil conspiracy in restraint of trade by deceptive means impacting state and federal decision-makers and contracts for the purchase and distribution of COVID-19 vaccines.

## I. PRELIMINARY STATEMENT

The Plaintiff/whistleblower claims the Defendants, through their agents in the media, commerce, scientific community, and government, conspired to commit acts of unfair and deceptive trade discovered by the Plaintiff after viewing, analyzing, and further investigating his former employer's participation in a videotaped "exercise" held October 2019, the "Event 201." [1] That "exercise" substantially predicted the COVID-19 outbreak, pandemic, and global response to

---

[1] The Southern District of Florida held that to establish a prima facie case under the Florida Private Whistleblower Act (FWA), *§448.102(3), Fla. Stat.*, a plaintiff must show an actual violation of a law, rule or regulation. *Graddy v. Wal-Mart Stores E., LP*, No. 5:16-CV-9-OC-28PRL (M.D. Fla. Feb. 14, 2017). During Plaintiff's employment with SCHEIN, he opposed the concealment of evidence material to the federal investigation by CDC and public health officials into the "Florida Dental AIDS Mystery." Upon becoming aware of SCHEIN's participation in Event 201, and suspicious about the authenticity of COVID-19 vaccine safety assurances, the Plaintiff/ whistleblower researched and analyzed the PFIZER and MODERNA research protocols and allegedly learned that HEARST and related media advertisements promoting the "novel" mRNA vaccines, especially for medically-compromised persons, were false and misleading pursuant to safety assurances. The misrepresented 'safety" could not be assured to any reasonable degree due to the facts cited below. The Plaintiff alleges the inclusion of HIV/AIDS "spike protein" genes in the COVID-19 disease vector has been unlawfully concealed or falsely dismissed or disparaged. The Plaintiff objected to these matters to the White House science director and acting director of the Department of Homeland Security in writing regarding alleged 'evidence tampering,' obstructing justice, and risking public health during a federal investigation, to no avail.

the emergency six (6) weeks before the outbreak was announced. Participants predicted outcomes including: (a) profits from the sale of vaccines, personal protective equipment, and more; and (b) loses to be leveraged through the shorting of stock, inter alia.

Based on the Plaintiff's discoveries, he realized that his former employer, HENRY SCHEIN, INC.'s (hereafter, "SCHEIN's") participation in the "exercise" engaged the company in a civil conspiracy to commit unfair and deceptive trade with the other Defendants risking public health and citizens' safety.

In 1993, SCHEIN had fired the Plaintiff/whistleblower for publishing scientific research that contradicted federal investigators' conclusion regarding the "mysterious" transmission of HIV/AIDS to six (6) dental patients in Stuart Florida in 1990. The Plaintiff's peer-reviewed scientific publications objected to federal officials having concealed evidence acquired during their investigation to keep the manner in which the AIDS transmissions occurred a "mystery." HOROWITZ was fired because he did not submit to the alleged health science fraud that ignited intense widespread fears of infectious disease transmissions in healthcare settings, prompting simultaneously an explosion of sales in personal protective equipment and infection control products and services sold by SCHEIN.

SCHEIN was and is now a leading public and private healthcare product and service supplier. SCHEIN distributes and advertises vaccines for PFIZER, INC. SCHEIN's alleged unfair and deceptive trade, the whistleblower realized, continues currently placing the public's health and safety at risk of adverse medical events and long-term genetic damage reasonably believed to contribute to cancers, new 'recombinant' viruses, viral outbreaks, and viral infections, and a growing number of immunological maladies.

Publicity for the PFIZER COVID-19 vaccine Phase 3 trial has substantially claimed or inferred "safety" of the new mRNA "genetic therapies" for general consumption. The vaccine's development was "fast-tracked" to be urgently distributed as advertised by the Defendants, who are allied with other large drug,

vaccine, and financial service providers. The Defendants' agents include major media, and several of the most influential marketing teams in the world.

The Plaintiff/whistleblower, however, has stood in the way of unethical vaccine science and the concealment of vaccination risks since 1996, proximal to his departure from SCHEIN. Following a three-year investigation into the origin of HIV/AIDS (1993-1996) commenced under SCHEIN's employment; and following-up on the aforementioned "Florida Dental AIDS Mystery," HOROWITZ published a book that CDC and World Health Organization officials have discredited; not by refuting the facts and science, but by claiming prejudicially that the work has no basis in science, or has been controverted by science. Officials have also encouraged the censoring and banning of HOROWITZ's book, since the work has substantially contributed to "vaccine hesitancy," thus must be banned for public health and national security reasons.

To make the Defendants' opposition and disrespect for the Plaintiff/whistleblower even worse, in 2008, HOROWITZ brought to market a broad-spectrum anti-microbial and anti-viral product trademarked OxySilver$^{TM}$ originally developed by NASA science that can serve as an alternative to antibiotics and COVID-19 vaccines for people with medical conditions who may not be able to tolerate drugs or vaccines. Furthermore, the Plaintiff's religious defenses has further contributed to "vaccination hesitancy" internationally, and is additionally justified by Bible laws prohibiting blood intoxication and genetic alterations.

Consequently, during the past several years, the Plaintiff's smearing by the Defendants' agents in the media, along with disparaging his OxySilver$^{TM}$ product similarly, has unlawfully restrained the Plaintiff's trade much like other pharmaceutical industry competitors, damaging millions of Americans whose "vaccination hesitancy" is either faith-based or medically necessary.

## II. JURISDICTION, VENUE AND DEMAND FOR JURY TRIAL

a.   This Court has jurisdiction over this matter under 28 U.S.C. § 1332 by reason of diversity citizenship of the parties; and the matter in controversy exceeds the sum or value of $75,000.

    b.   Venue in this District is proper under 28 U.S.C. § 1391 et. seq.

    c.   The Plaintiff requests a <u>Trial by Jury</u>.


## III. THE PARTIES AND PERSONA

### A. Plaintiff

1.   Plaintiff **LEONARD G. HOROWITZ** is a California domiciled individual with temporary residences in Las Vegas, NV and Cape Coral, Florida. He is a retired doctor of medical dentistry and oral surgery, a Master of Public Health recipient from Harvard University, a Levitical priest by bloodline, a "CJA Expert" investigator in medical/legal proceedings registered with the U.S. District Court in Hawaii, and between 1990 and 1993 was the chief professional advisor for Defendant HENRY SCHEIN, INC. in Port Washington, New York.

2. "Dr. Horowitz" developed the "Schein Professional Advisory Research Counsel" ("SPARC"); personally trained nearly 30,000 healthcare professionals between 1990 and 1993 during continuing education programs in "infection control" and "AIDS patient care;" published for SCHEIN the *AIDS, Fear and Infection Control* medical training manual, the *Dentistry in the Age of AIDS* guidebook for dental professionals, assorted literature and articles for public education; and brought to market therapeutic products that were advertised and sold by SCHEIN online and through the company's representatives.

3. The Plaintiff also pioneered and brought to market therapeutic products and equipment bearing on his research in the fields of water science, genetics,

photodynamic therapies, and bio-acoustic remedies featuring a special frequency of sound, 528Hz, proven by independent investigators to substantially increase anti-oxidant activity suitable for boosting natural immunity. Accordingly, based on the Plaintiff's fields of expertise, he brought to market several consumer products, among which is the natural antibiotic and "vaccine substitute" called "OxySilver™ with 528" recommended for medically-compromised people for whom injected vaccines are risky, as well as for religious and philosophical objectors.

4. As mentioned, OxySilver™ was initially developed by NASA scientists. HOROWITZ substantially enhanced the product by incorporating "structured water," plus 528nm of green-light energy, and 528Hz frequency of sound energy, to impart a homeopathic-like quality or "memory" to the solution presumed to cause the scientifically-recorded increase in anti-oxidant activity.[2]

5. In 1993, Plaintiff published a series of research articles and a book that SCHEIN officials did not like, detailing facts and science explaining how and why a Florida dentist infected six of his patients with his strain of HIV/AIDS.

6. Disagreements over these publications caused SCHEIN officials to terminate HOROWITZ's contract; and the Plaintiff was promptly 'black-listed' from speaking and selling his products at professional conferences as he had been doing.

7. Subsequently, in 1996, the Plaintiff published another book, *Emerging Viruses: AIDS & Ebola—Nature, Accident or Intentional?* that became the "Top-seller in the field of AIDS and second in the fields of infectious disease and communicable disease," according to *Wikipedia* and Amazon.com.

8. Following his early publications in consumer health education, the Plaintiff took a special interest in researching the origins of emerging viruses and infectious

---

[2] Anti-oxidant activity forms the basis of nutraceutical efficacy in several anti-COVID-19 prescriptions including vitamins C and D, Zinc, chlorophyll, hydroxychloroquine, and likewise OxSilver™ that resonates the 528Hz/nm frequency of sound and light (phonons and photons) independently determined by scientists to substantially increase anti-oxidant activity.

diseases—subjects considered 'mysterious,' controversial, and academically restricted.

9. From his publications in these fields, the Plaintiff became internationally known for educating citizens about political censorship of vaccination risks damaging public health and causing consumers "vaccination hesitancy".

10. In 2016, HEARST published a feature article in *Popular Mechanics* that smeared the Plaintiff's reputation, and misrepresented the ingredients of OxySilver$^{TM}$ to disparage both the doctor and his anti-microbial product, damaging acceptance of the Plaintiff and his healthcare product line that relies on OxySilver$^{TM}$ with 528 resonance as major ingredients.

11. In May, 2018, HEARST's Corus Entertainment published another "hit piece" attacking the Plaintiff's reputability and disparaging the Plaintiff's '528 industry' the doctor had pioneered and developed through substantial research and investments.

**B. Defendants**

**a. HENRY SCHEIN, INC.**

12. Defendant HENRY SCHEIN, INC. (hereafter, "SCHEIN") describes its business as providing products and services to integrated health systems, designed specifically for and focused exclusively on, the non-acute care space.

13. SCHEIN is incorporated in Delaware, with its principal place of business located at 135 Duryea Road, Melville, NY 11747.

14. SCHEIN distributes, among other things, branded and generic pharmaceuticals to customers that include dental practitioners, dental laboratories, animal health practices and clinics, and office-based medical practitioners, ambulatory surgery centers, and other institutions.

15. At all relevant times, SCHEIN was in the business of distributing, and redistributing, pharmaceutical products to consumers within the state of Florida and elsewhere.

16. In 2015, SCHEIN reported that its sales reached a record $10.4 billion and that it had grown at a compound annual rate of approximately 16 percent since becoming a public company in 1995.

17. Overall, it is the world's largest provider of health care products and services to office-based dental, animal health, and medical practitioners.

18. As a world leading generic drug and vaccine distributor SCHEIN sells PFIZER products in health professional markets.

19. From 1990 through 1993, the Plaintiff was contracted by SCHEIN to develop professional education programs and a professional advisory group to advise senior-level managers advancing product acquisitions, sales and marketing programs.

20. SCHEIN officials terminated the Plaintiff's contract when the Plaintiff/whistleblower refused to censor his scientific research acquired with the help of the FBI, evidencing alleged CDC investigators' wrongdoing (e.g., fraudulent concealment) in the quintessential case that prompted explosive growth in the 'infection control industry' to prevent the spread of HIV/AIDS in healthcare settings. (That is, the "Florida Dental AIDS Tragedy" involving a Stuart, Florida dentist who infected six of his patients with his strain of HIV.)

21. Since that time, SCHEIN has recorded a history of alleged wrongdoings. On October 19, 2013, SCHEIN agreed to pay $1,140,260 for allegedly violating the Civil Monetary Penalties Law applicable to physician self-referrals and kickbacks.

22. On January 8, 2019, SCHEIN settled a class action anti-trust lawsuit paying $80 million to damaged professionals overcharged for products including personal protective equipment (such as masks) and infection control supplies.

23. On December 5, 2019, SCHEIN et. al. was sued by the Florida Health Sciences Center, Inc. et. al., in the U.S. District Court of Southern Florida (0:2019cv62992) for distributing falsely and deceptively marketed opioids contributing to the "Opioid Crisis" in America. Prosecutors cited ten "Falsehoods"

8

promulgated by the 'marketing defendants' to advance their deceptive trade. The civil action detailed the damage done to society by the defendants' fraudulent advertising and "inadequate compliance" with staffing and training required to safely advance their drug trade.

### b. PFIZER INC.

24. **PFIZER INC.** is an American multinational pharmaceutical company headquartered in New York City at 235 E 42nd St, New York, NY 10017. PFIZER, INC. produces antibiotics and vaccines as one of the world's largest pharmaceutical companies with revenue in 2019 reported at $ 51.75 billion USD.

25. In November, 2004, PFIZER signed an agreement with Genstruct Inc., largely financed by Flagship Pioneering –the company that financed Defendant MODERNA's startup—to collaborate on a variety of "novel" research projects aimed at treating complex diseases.

26. Material to this Compliant alleging consumer fraud by PFIZER and MODERNA, in 2009 PFIZER set a record for the largest health care fraud settlement and the largest criminal fine of any kind with $2.3 billion assessed.

27. PFIZER's commercial reach is extensive in generating federal contracts. The company's CEO, Albert Bourla, served on the Health Section Governing board of the Biotechnology Innovation Organization, the world's largest biotechnology trade association. He is a board member of the Partnership for New York City (PFNYC) that is advertised as "a select group of nearly three hundred CEOs ("Partners") from New York City's top corporate, investment and entrepreneurial firms. The organization was founded by David Rockefeller in 1979, with the aim of working closely with government, labor and the nonprofit sector to enhance the economy and maintain New York City's position as the global center of commerce, culture and innovation." *Wikipedia*.

28. Mr. Bouria also serves on the board of the Pharmaceutical Research and Manufacturers of America (PhRMA), the main trade association representing companies in the pharmaceutical industry in the United States. On September 8, 2020, "BIOPHARMA LEADERS" (i.e., the enterprise partners) published a group statement advertising the companies' commitment to safety testing their COVID-19 vaccines.

29. PFIZER is one of few companies to publicly promote a drug discovery partnership using IBM Watson. In December 2016, PFIZER and IBM announced a partnership to accelerate drug discovery in immuno-oncology.

30. "We see a pattern here," said Prashanth Pradhan, Watson Business Leader for South Asia, and world leading COVID-19 genetic analyst using IBM's Watson computer. "The big leaps for artificial intelligence ["AI"] are in domains that exhibit a lot of scale," *The Economic Times* quoted.

31. In January, 2020, Pradhan et. al.'s Watson computer analysis recorded four (4) genes from the AIDS virus comprised the substantial part of the COVID-19 virus "spike protein" infection mechanism. Pradhan's publication was subsequently "withdrawn."

32. On October 22, 2020, PFIZER and IBM announced another joint venture in AI to aid in predicting mental/neurological diseases impacting human memory.

### c. MODERNA, INC.

33. **MODERNA INC.** is an American biotechnology company headquartered at 200 Technology Square. Cambridge, MA 02139. This company commercializes in drug discovery, drug development, and vaccine technologies based exclusively on messenger (m)RNA.

34. According to a Flagship Pioneering press release promoting "Moderna Therapeutics" in 2016, PFIZER's investment partner largely financed the

MODERNA startup, and has "ongoing corporate innovation alliances with several market leaders, including: AstraZeneca, Bayer Crop Science and Nestlé Health Science."

35. MODERNA claims their mRNA product is a suitable "vaccination" against COVID-19, as similarly commercialized by PFIZER, INC and its German partner, BioNTech.

### d. HEARST CORPORATION

36. **HEARST CORPORATION** (hereafter, "HEARST") is an American multinational mass media, business information, and consumer education conglomerate that is based in the Hearst Tower in Manhattan, at 300 West 57th Street and 959 Eighth Avenue, New York, NY.

37. HEARST properties include: First Databank, a leading healthcare industry advisor and drug and vaccine online sales tool; Corus Entertainment–a Canadian mass media enterprise, Filch Ratings advising drug and vaccine investors (inter alia), and Litton Entertainment that specializes in children's educational programming.

38. HEARST's partners on projects and promotions include NBC Universal Media, Inc. and iHeart Radio. HEARST owns a 50% stake in A&E Networks and The History Channel; and a 20% stake in ESPN, both in partnership with ABC Disney Co.

39. In June, 2007, HEARST's First Databank ("FDB") settled a federal lawsuit with a Boston-based consumer coalition accusing HEARST and its partner, the McKesson Corporation, of artificially inflating drug prices. The lawsuit said that McKesson and FDB conspired from 2002 through 2005 to set the list prices artificially high. FDB was accused of limiting its survey of wholesalers to exclusively McKesson.

40. On June 28, 2010, McKesson and PFIZER announced their partnership "to support pharmacists' role in patient care, citing World Health Organization data as defining the need for their partnership as America's preeminent drug and vaccine portal.

41. McKesson, PFIZER, MODERNA, SCHEIN, IBM, GOOGLE and FACEBOOK share the same largest stockholders, namely the largest "institutional investors:" These include the Vanguard Group, Inc.; Blackrock Fund Advisors; State Street Global Advisors, Inc. (SSgA Funds Management, Inc.); and Geode Capital Management.


## IV. STATUTES OF LIMITATIONS

42. The four-year statute of limitations has not run on the HEARST/Corus Entertainment latest act of alleged tortious interference with prospective business advantage in 2018.

43. Nor has the limitation period run on the tort claim under the Florida Private Whistleblower Act (FWA) since this action was prompted by the January 2020 discovery of SCHEIN's participation in the "Event 201" coronavirus preparedness "exercise".

44. That exercise, co-sponsored by The Bill & Melinda Gates Foundation, Johns Hopkins University, and the World Economic Forum, precisely predicted what would occur approximately six (6) weeks later when reports of the COVID-19 pandemic began emerging from Wuhan, China.

45. The unprecedented predictive exercise called "Event 201" prompted the Plaintiff to make discoveries material to the claim of civil conspiracy brought herein.

46. In addition, the Plaintiff brings this action for PFIZER and MODERNA's alleged conspiracy to defraud the United States in violation of 18 U.S.C. § 371,

12

pursuant to misrepresenting the "safety" of Defendants' mRNA COVID-19 vaccines, as authorized by 42 U.S.C. § 1988(b). These discoveries evidence overt acts of concealing known and scientifically-presumed genetic risks, and risks to individuals with pre-existing medical conditions, in furtherance of the conspiracy to defraud the United States and the public to profit from the pandemic. Here, the statute of limitations begins to run on the date of the last overt act, which is the present time. *See Fiswick v. United States*, 329 U.S. 211 (1946); *United States v. Butler*, 792 F.2d 1528 (11th Cir. 1986).

47. For conspiracy statutes which do not require proof of an overt act, such as RICO (18 U.S.C. § 1961) or 21 U.S.C. § 846, the Whistleblower files this action in defense of the Government and consumers as authorized by 42 U.S.C. § 1988 (a.k.a, the "Private Attorney Generals Act"); wherefore the Plaintiff alleges that the conspiratorial agreement, and the conspiracy itself, is continuing. *See United States v. Northern Imp. Co.*, 814 F.2d 540 (8th Cir. 1987); *United States v. Coia*, 719 F.2d 1120 (11th Cir. 1983), *cert. denied*, 466 U.S. 973 (1984).[3]

48. The Plaintiff suffered tortious interference by HEARST's smear campaign, as well as damages from 'industrial disparagement,' neither of which claims could be attributed to a tortious injury until "someone from the scientific community found and revealed publicly a link"[3] between the libeling and discrediting of the Plaintiff and his anti-viral "OxySilver[TM] with 528" technology and the Defendants' scheme and conspiracy to defraud the federal government and society by falsifying COVID-19 safety averments in favor of Defendants' alleged monopoly.

49. This Sherman Act violation unlawfully and damaging deprives competition in the anti-viral and anti-bacterial marketplace, depriving the public of the benefits

---

[3] The "Event 201" "time of discovery" provided facts herein tolling the statute of limitations on his waived claim for Defamation per se, viable under the "time of discovery" rule, which is also known as the doctrine of "inherently unknowable injury." *BTIG, LLC v. Palantir Technologies, Inc.*, C.A. No. N19C-08-314 EMD CCLD (Del. Sup. Ct. Jan. 3, 2020), citing *Brown*, 820 A.2d 362, 366 (Del. 2003).

of the Plaintiff's OxySilver™, at the same time monopolizing anti-COVID-19 remedies. This alleged scheme to secure unfair competition and deceptive trade subjects the Plaintiff to tortious interference and civil conspiracy, and places medically-compromised consumers and public safety at risk.

50. Damages from the alleged causes of action include the devastating socio-economic and health impacts of government-imposed 'lockdowns' of schools, workplaces, religious, community, and sports gatherings, and more. These impositions continue at the time of this filing and must be reconsidered in the context of facts evidenced and Claims made in this case.

51. Therefore, timely injunctive relief on behalf of the government, society, and Plaintiff is needed and justified, particularly as pending FDA approvals of the PFIZER and MODERNA mRNA vaccines may be influenced by the matters and facts revealed herein and concealed by the Defendants. Resulting determinations and certifications by the FDA without this intelligence may harm equally ill-informed consumers and citizens subjected to pending and anticipated vaccine mandates that depend largely on the FDA's certification proceedings ongoing at the time of this filing.

52. Summarily, the Plaintiff/whistleblower claims damages and public health risks from Sherman Act violations, tortious interference with prospective business advantage, intertwined with retaliatory defamation per se in a civil conspiracy defrauding the government and society.

53. Pursuant to "time of discovery," HOROWITZ only gained evidence of these injuries when 'the previously unknown associations and business alliances' became known in January 2020 through the "Event 201" videotaped proceedings. This "exercise" provided probable cause for the Plaintiff to investigate SCHEIN's connections to the other Defendants, revealing the first element of the alleged conspiracy. That is, to 'neutralize' the AIDS-science emerging-viruses expert and whistleblower through the Defendants' media agents. This would prevent

14

HOROWITZ's discoveries from becoming widely known, accepted, and damaging to the pharmaceutical industry and vaccine hegemony.

## V. FACTS

### A. Introductory events

54. Between 1990 and the present HOROWITZ established himself as a world leading AIDS educator and infection prevention expert based on his having personally-trained nearly 30,000 healthcare professionals across North America (1990-1993) under a $40,000/year part-time contract with SCHEIN—a leading drug and vaccine seller for major pharmaceutical companies.

55. During that time, HOROWITZ routinely instructed his audiences to get vaccinated with hepatitis B vaccines despite having insufficient knowledge of the generally concealed risks. HOROWITZ was unaware these little-known risks were damaging people.

56. By 1993, HOROWITZ had acquired and published substantial scientific evidence bearing on a Florida dentist, Dr. David Acer ("Acer"), who infected six (6) patients with his strain of HIV/AIDS. The Florida dentist, and his sources in the scientific and military intelligence communities, alleged the AIDS virus contaminated hepatitis B vaccines given to gay men in New York City. Acer believed this is how he became infected.

57. By 1993, at the request of SCHEIN company customers and colleagues in the public health community, HOROWITZ had researched Dr. Acer's controversial allegations. From this investigation the Plaintiff discovered that the likeliest cause of the cross-infections was intentional injection of Dr. Acer's patients with his tainted blood during the administration of local anesthetics.

58. HOROWITZ arrived at this logical conclusion after gathering facts
and evidence and applying the research protocols of the Federal Bureau of
Investigation ("FBI") from which he proved by a preponderance of evidence that
the case most proximally reflected serial homicide.

59. HOROWITZ then published a series of scientific peer-reviewed articles
explaining the mysterious AIDS transmissions in efforts to contribute to science
and allay the public's irrational fear of getting or transmitting AIDS through
healthcare facilities.

60. By 1993, however, after three years of explosive sales in infection-control
products and equipment, solving the "Florida Dental AIDS Mystery" and allaying
the public's fear was not appreciated by SCHEIN's directors. HOROWITZ's
publications and professional presentations suddenly met substantial resistance and
censorship by SCHEIN leaders, industry officials, and the corporate-controlled
media.

61. SCHEIN officials, including Director of Marketing, Gail Koenigsburg; Jimmy
Breslawski, the President of SCHEIN; and Stanley Burgman, the CEO of SCHEIN,
had a meeting of the minds to terminate HOROWITZ's contract by reason of what
Ms. Koenigburg alleged, "You're like a wild horse that we can't control."
Koenigburg lamented the Plaintiff's controversial published science, its political
ramifications, and diverted from the fact that by 1993 SCHEIN stood to lose
billions of dollars largely gained by exploiting irrational fears of HIV circulating in
healthcare settings motivating infection control product sales and services through
SCHEIN.

62. HOROWITZ objected to the SCHEIN leaders' unethical conduct and refused
to participate in exploiting Acer's apparent serial homicide in order to defraud the

public for financial gain. It occurred to the Plaintiff that this imposition was akin to deceptive trade fostering and exploiting 'germaphobia' in society, and irrational fears in medicine and dentistry, as well as exacerbating dental phobias that HOROWITZ was a leading expert in treating.

63. After being terminated from SCHEIN, other continuing professional education providers, including state and national dental, medical, and chiropractic associations, 'black-listed' HOROWITZ from speaking.  The coordinated shut-down depriving the Plaintiff/whistleblower of professional free speech occurred, but there was no evidence to prove conspiracy.

64. Between 1993 and 1996, HOROWITZ continued investigating the belief held by the suspected killer, Acer, that the military and pharmaceutical industry had developed AIDS. During this time, the Plaintiff/whistleblower discovered the earliest bio-engineering of "special" cancer viruses and hepatitis B vaccinations financed by Congress through the National Institutes of Health ("NIH"), the National Cancer Institute ("NCI"), and Litton Bionetics ("Litton")—a leading U.S. military and pharmaceutical industry cancer virus manufacturer, supplier, and leading provider of the biologicals and animals needed by government and industry to advance research and developments in this burgeoning field of genetic engineering under a largely funded mostly secret "Special Virus Cancer Program."

65. By 1996, HOROWITZ published a best-selling book in this field of AIDS, Ebola, and other emerging infectious diseases that met with commercial success and widespread professional praise; but his academic and industrial black-listing continued along with substantial resistance, defamation, and censorship by medical industry officials and the corporate-controlled media.

66. In 1998, HOROWITZ published another best-selling book titled *Healing Codes for the Biological Apocalypse* that relayed musical frequencies hidden in the

Bible, known in orthodox Catholicism as the "Solfegio scale." According to legend, these musical notes impact spiritualty, especially the third note, 528Hz frequency, claimed to be the "key of the House of David" (Isaiah 22:22; Rev. 3:6-8).

67. HOROWITZ, a health scientist and Levitical priest by bloodline, especially studied this 3rd note of 528Hz pursuant to its potential therapeutic value—a reasonable exploration given that King David played a "healing harp." Furthermore, the Solfeggio Bible code identified this as the "MI" tone (short for the Latin term "Mira-Gestorum") for allegedly producing *miracles*. Consequently, HOROWITZ wondered whether this frequency might be used to produce hastened recoveries, so he began to study and apply this knowledge of musical (frequency) mathematics to the healing arts and sciences.

68. From this knowledge, the Plaintiff developed a new potentially therapeutic industry based on the importance of 528Hz and related sound and light frequency discoveries, their impacts on DNA/genetics, organic chemistry, and the health sciences.

69. Applying the Plaintiff's knowledge further, HOROWITZ brought to market a novel broad-spectrum anti-viral and anti-bacterial vaccine and drug competitor in 2008 pioneered initially by NASA science that the Plaintiff trademarked *OxySilver*[TM], and promoted as "OxySilver[TM] with 528".

70. HOROWITZ directed the manufacture of OxySilver[TM] with 528 to incorporate his religious and scientific convictions that the sound and light of 528Hz/nm was useful to advancing science and water-structuring to increase homeopathic-like 'resonance frequency memory,' therapeutic efficacy, and enhanced anti-oxidant activity.

71. By 2008, after HOROWITZ successfully launched OxySilver[TM] with an

interview on iHeart Radio/Clear Channel's *Coast-to-CoastAM* with George Noory, news of HOROWITZ's AIDS virus discoveries spread across Black and Islamic communities internationally. Subsequently, HOROWITZ's publications increasingly influenced events in Africa and even the presidential election in America.

72. Barack Hussein Obama's campaign that year was substantially challenged by controversy sparked by Obama's minister of 20 years, Reverend Jeremiah Wright. Media smears and slurs forced Rev. Wright to defend his "God-damn America" speech before the national press on April 28, 2008, in which he cited the Plaintiff's book, *Emerging Viruses: AIDS & Ebola—Nature, Accident or Intentional?,* as justification for the Black community's concern that HIV was manufactured in a U.S. military lab and released through hepatitis B vaccines disproportionately killing people of color.

73. Within 48 hours, on April 30, 2008, *Wikipedia* editor "David Eppstein," wrote about deleting the Plaintiff's biography thusly, "Note: This debate has been included in the list of Medicine-related deletion discussions." Eppstein overruled fellow editors' arguments opposing the deletion of HOROWITZ's biography that had been used for years to discredit the Plaintiff as "merely a dentist" and "conspiracy theorist."

74. Soon thereafter, by 2009 through to the present, the Plaintiff was repeatedly gang-stalked, harassed, defamed, censored, discredited, and personally, professionally, and commercially damaged by online agents and media provocateurs presumably allied with the Defendants.

75. HOROWITZ's media interviews similarly vanished. The Plaintiff had been a "regular" guest on *Coast-to-CoastAM* broadcasting to approximately 7 million listeners through iHeartMedia, Inc. and Clear Channel Communications, Inc.,

companies that partner in joint-ventures with HEARST through A&E Networks and ABC Disney Television. Suddenly this regularity diminished and subsequently terminated altogether after broadcasters directed HOROWITZ to conceal the identities of the lead agents known to be directing the defamatory cyber-attacks against the Plaintiff.

76. Soon, OxySilver$^{TM}$ sales plummeted from approximately $1 million annually between 2008 to 2010, to less than $200,000.00 in 2011, 2012 and forward.

77. By 2015, the Poynter Institute, that smears publications and publishers advancing facts corroborating HOROWITZ's AIDS-origin thesis, launched the International Fact-Checking Institute (IFCN), which sets a purported "code of ethics" for fact-checking organizations.

78. Google/YouTube, Facebook, Vimeo.com, *Wikipedia*, and 'Big Tech' companies that consistently censored the Plaintiff, justified such deprivation of equal rights to free speech by reason of the IFCN's certification program vetting publishers and offenders pursuant to "fact-checking."

79. In November 2015, the world's leading vaccine financier and distributor, The Bill & Melinda Gates Foundation, granted The Poynter Institute for Media Studies, Inc. $382,997 to develop intelligence on the topic: "Global Health and Development Public Awareness and Analysis." The "Program: Communications" largely established the system of online surveillance and influence pursuant to "fact-checking," justifying censorship and public persuasion favoring vaccinations.

80. It may be reasonably presumed from the documented evidence gathered by HOROWITZ that the corporate-controlled media's censoring and disparaging the Plaintiff is committed to defend pharmaceutical-industry interests, protect their markets, and evade the extensive liability arising from the Plaintiff/whistleblower's

AIDS-origin vaccine-transmission science—what the status quo claims is discredited "conspiracy nonsense," yet material to PFIZER and MODERNA's mRNA vaccines developed using "spike protein" genetic-engineering based on HIV research and developments unearthed and made public by HOROWITZ.

**B. Background on censorship, libel, and deceptive trade.**

81. A 2010 "Final Report" on the "News Media Industry" published by the Industrial College of the Armed Forces repeatedly cites the Poynter Institute as a credible source of military industrial intelligence and news media analysis.

82. In 2015, the Poynter Institute's publication *PolitiFact* advertised Col. Stanley McChrystal and linked to his business, the McChrystal Group (hereafter, "MG"), reporting that information output by this former military commander and 'military-style' manager directing a *public persuasion* organization is "mostly true."

83. The MG serves as America's leading COVID-19 emergency response management firm contracted by large city governments to purportedly protect large populations. At the time of this filing, the MG is commissioned by Big Tech and Big Pharma companies by-reason-of McChrystal's most active public-persuasion agents influencing governments and industry. This enterprise promotes or disparages consumer-health products as well.

84. In 2016, Private investigators JT Kong and the Plaintiff's partner, investigative journalist, Sherri Kane, discovered the main "cell" of agents and agencies allied with McChrystal and his MG disparaging the Plaintiff.

85. Kong and Kane published that the MG, and by extension their Poynter Institute advertiser, acting within America's most influential online 'cyber-propaganda' network, marketed products and services sold by America's leading consumer health companies.

86. The MG and Poynter Institute pharmaceutical commercial enterprise administered interrelated management strategies largely influencing or controlling the public's mindset and 'general agreement' on virtually all matters of personal health and pharmaceutical safety, including the claimed "safety and efficacy" of vaccinations.

87.   From evidence discovered and published by Kong and Kane, the Plaintiff learned that MG's business services, directed 'militarily' by Stanley McChrystal, the former commander of US and International Security Assistance Forces (ISAF) in Afghanistan, and the former commander of the nation's premier military counter-terrorism force, the Joint Special Operations Command (JSOC), was overseeing the main "cell" of covert operatives smearing, stalking, and cyber-bullying leading whistleblowers, including HOROWITZ and other activists, doctors, and researchers designated "anti-vaxxers."

88. The 'targets' were designated serious risks to "National Security," particularly those leading the "anti-vaccination movement" and causing "vaccine hesitancy."

89. Discovery gathered and published by the Plaintiff's team exposed McChrystal's alliance with a cell of agents, most notably Harvard lawyer Colin McRoberts who ran two organizations within the counter-intelligence enterprise advancing public-persuasion communications online—SABonline.com—and its 'cookie cutter' business partner, the allegedly/presumably sham "Learning Group" called PRISM. Both presumed 'cyber-fronts' published similar websites containing virtually the same information.

90. Both SAB and PRISM were populated by exclusively Harvard doctors and lawyers, but misrepresented their personnel, including Shahzad Bhatti and his wife, Dr. Joanne Simon, MD. MPH.

91. Tracking Bhatti and Simon on the Internet, Plaintiff's team learned that Colin McRoberts lied about his and McChrystals' two front companies—SAB and PRISM. The Bhattis actually worked for "Axiom Learning" funded by world leading vaccine distributor and vaccination promoter, Bill Gates.

92. The Plaintiff took screenshots of the suspects' web pages showing close ties to another pro-vaccine propaganda firm called Crosslead, clearly allied with the MG. Both agencies used the same website template and both groups were controlled by McChrystal, albeit employing different personnel.

93. These alleged cyber-gangs appeared to be part of an extensive commercial propaganda enterprise commissioned by the Defendants privies-in-interest to disseminate propaganda worldwide through the mainstream and social media.

94. The aforementioned enterprise published pro-vaccination videos, articles, and television commercials targeting groups of all ages. Their campaigns smeared "anti-vaccinationists" called "radicals" or "health nuts." Targets were treated like "insurgents" in a cyber-war.

95. Crosslead's client list and advertising sponsors included health education and persuasion leader RALLY Health, Inc., and First Data that is owned by Kolberg, Kravits and Roberts (KKK) that is heavily invested in the healthcare industry.

96. First Data is a credit and debit card payment processor and former parent of Western Union with a large footprint in health commerce. In June 2017, First Data launched Fraud Detect, which uses artificial intelligence and machine learning, fraud scoring, cybersecurity intelligence, and information from the "Dark Web" to identify potentially fraudulent transactions. (As mentioned below, the allied Big Tech companies use similar technology to identify, track, censor and discredit targets.)

23

97. In July 2017, First Data's owner, KKR, acquired WebMD Health Corp, and in August acquired PharMerica that operates a major customer support center in Tampa, Florida. This is the second largest administrator of institutional pharmacy services, with a customer base of 330,000 "beds" in 41 U.S. states. It operates hospitals, nursing centers, and contract rehabilitation services businesses.

98. To secure their commercial interests against natural cure upstarts and anti-vaccination competitors, the Defendants' properties and allies leveraged leading public education persuasion properties, such as WebMD .

99. Criticizing KKR's property, WebMD, *The New York Times Magazine* published an article titled, *"A Prescription for Fear" (February 6, 2011)* criticizing WebMD for biasing readers toward drugs that are sold by the site's pharmaceutical sponsors. The readers are often sold unnecessary drugs the article noted. The author wrote that WebMD "has become permeated with pseudo-medicine and subtle misinformation." Another article published by Vox Media criticized WebMD for encouraging hypochondria and for promoting treatments for which evidence of safety and effectiveness is weak or non-existent.

100. Further evidencing the Defendants' concealed, deceptive, and cohesive enterprise, as noted previously, each of the Defendants' top institutional investors and stockholders are the same companies. That is: The Vanguard Group, Inc.; Blackrock Fund Advisors; Geode Capital Management, LLC; and State Street Group Management, Inc.

101. Further explaining how PFIZER and MODERNA exclusively advanced mRNA vaccines for COVID-19, MODERNA's few early heavy investors in December 2018 included Viking Global Investors whose subsidiary Rockefeller & Co. LLC is closely tied to PFIZER's CEO, Albert Bourla, a board member of the

24

David Rockefeller founded Partnership for New York City (PFNYC).

102. Aside from the aforementioned financial alliances comprising the key enterprise influencing healthcare and consumer confidence in drugs and vaccines--conflicting interests are apparent between the Poynter Institute and The Bill & Melinda Gates Foundation. In 2017, Poynter's IFCN received a $1.3 million grant from the Omidyar Network and George Soros's Open Society Foundations. At the same time the Soros Fund purchased 31, 200 shares of PFIZER stock, vicariously joining Bill Gates's investments in the Defendants.

103. Meanwhile, beginning in 2014 and continuing, PFIZER financed the Johns Hopkins Univ. program mapping "Strategic Immunization" in "Low-and Middle-income Countries," and in 2018, when PFIZER's partners began financing MODERNA, PFIZER financed efforts at Johns Hopkins to optimize delivery of cancer virus vaccine "neoadjuvants" for advancing chemotherapies.

104. Contemporaneously, as Defendant HEARST and its aforementioned allies in commerce and propaganda extended their smear campaign against the Plaintiff and "anti-vaxxers," The Poynter Institute for "Fact-Checking" and social-engineering applauded HEARST's expansion strategies increasing profits and persuasive power in the media.

105. In September 2016, *Popular Mechanics*, owned by HEARST that shares the aforementioned institutional investors with Defendants PFIZER and MODERNA, and substantially profits from the sale of PFIZER and MODERNA drugs, vaccines, and advertisements through HEARST media's partnerships in healthcare-commerce, published a feature article disparaging HOROWITZ and his OxySilver[TM] with 528.[4]

---

[4] HEARST's partner in commerce is the McKesson Corporation—the nation's "leading healthcare company for wholesale medical supplies & equipment, pharmaceutical distribution, and healthcare

106. The HEARST article discussed the doctor's "flagship product, OxySilver"; and *falsely published* that it "included 5 micrograms of colloidal silver."

107. The *Popular Mechanics* article also smeared fellow vaccine 'adverse event' whistleblower, Dr. Andrew Wakefield and:

   (a) described the Plaintiff as person who "bore a strong resemblance to the Count from Sesame Street" (i.e., a subtle anti-Semitic character slur accenting the big nose Jewish caricature);

   (b) *misrepresented* the Plaintiff's book and scientific evidence therein stating, the 1996 book "theorized the AIDS and Ebola viruses are genocidal weapons engineered by the U.S. government to depopulate the planet through vaccination programs"; and

   (c) *misrepresented* the Plaintiff's industry in "528 hertz, rather than the 440 hertz of standard tuning, . . ."

108. The HEARST article omitted the Bible origin, religious implications, and health benefits of 528Hz, and misrepresented HOROWITZ's conclusion that 440Hz standard tuning was "an evil plot imposed by the Rockefeller Foundation to militarize the world's populace."

109. In May, 2018, HEARST's Corus Entertainment in Canada published another "hit piece" attacking the Plaintiff's reputability and disparaging his '528 industry.'

110. That HEARST Corus Entertainment smear converted the Plaintiff's

technology solutions," (according to *Wikipedia*). The McKesson alliance, and smearing of HOROWITZ, also favored profits for HEARST's First Data Bank and Filch credit rating agency encouraging investments in certain drug and vaccine makers.

528Radio.com listening audience, OxySilver™ customers, and newsletter subscribers, to a competing commercial enterprise making false and misleading claims that 432Hz is a superior, more therapeutic, alternative musical tuning to 528Hz.

111. As aforementioned, in October 2019, The Bill & Melinda Gates Foundation, Johns Hopkins University, and the World Economic Forum, sponsored "Event 201"—a coronavirus preparedness "exercise" in which SCHEIN was represented along with HEARST's partner NBC Universal that includes the NBC Universal Music Group, the world's leading musical entertainment company.

112. The Plaintiff viewed this videotaped conference on-or-about January 15, 2020, causing HOROWITZ to identify NBC's Hasti Taghi (who the event advertisers identified simply as someone who "serves in a chief of staff capacity at a major media company") in addition to previously unknown partnerships, alliances, and activities from which this instant Complaint derives.

## C. The Conspiracy: Plaintiff's notice to federal investigators.

113. On January 21, 2020, soon after the COVID-19 pandemic became headline news, Luciana Borio, VP at In-Q-Tel—the CIA's investment firm intertwined with Google—told *BioCentury* that, "Public health measures including the development and deployment of diagnostics, possibly supplemented by therapeutics, will be keys to containing the outbreak.

114. Borio is a former director for medical and biodefense preparedness at the White House National Security Council."

115. Thusly prompted, on February 10, 2020, the Plaintiff wrote to the White House Director, Executive Office of the President, Office of Science and Technology Policy, Washington, DC, the Honorable Kelvin K. Droegemeier, and the Acting Secretary of the U.S. Department of Homeland Security, Chad Wolf, in response to Mr. Droegemeier's letter of February 3, 2020, requesting the National Academy of Science to provide a "Rapid Response Assessment . . . that would help determine the origins of 2019 2019-nCoV, specifically from an evolutionary/ structural biology standpoint."

116. The Plaintiff thereby provided federal officials with notice and probable cause to investigate the scientific publication of Prashant Pradham, the Chief Technical Officer for IBM, whose team used the Watson computer to analyze genetic similarities between the pandemic coronavirus and other sequenced viruses, including the AIDS virus, HIV-1, concluding as the Plaintiff had also concluded from circumstantial evidence that the COVID-19 disease sourced from a lab, and that the viral "vector" did not evolve naturally in bats. Plaintiff noticed federal officials, that "Unmistakably, 2019 nCoV contains a 'smoking gun'--the AIDS virus envelop gene—prima facie evidence of a lab virus 'recombinant'."

117. Subsequently:

(a) No reply issued from the informed federal officials;

(b) Prashant Pradham's group's genetic determinations were corroborated by other world leading experts; then quickly "withdrawn" precluding peer-reviewed publication.

(c) The AIDS virus co-discoverer and Nobel Prize winner, Luc

Montagnier, expressed disappointment that Pradham's group became "politically pressured" to retract their scientific publication that had already received worldwide informal peer review and justifiable concern; and

(c) No major media attention was ever given to this quintessential discovery.

118. The alleged "evidence tampering" of Watson's determinations reported by Pradhan's group represented an obstruction of the federal government's investigation.

119. The foul-play was further corroborated by the fact that PFIZER's and MODERNA's mRNA "vaccine" exclusively mimics the AIDS-virus attachment apparatus "spike protein" that Pradhan's group identified in the "novel" SARS-coronavirus plague vector.

120. Very early in the COVID-19 pandemic, in January 2020, Pradhan's group of nine highly-reputable genetic analysts "surprisingly" determined that each of four (4) SARS-coronavirus spike protein inserts "aligned with short segments of the human immunodeficiency Virus-1 (HIV-1) proteins."

121. Although this science paper was later retracted, reportedly due to political and financial pressures applied, this group concluded that, "[t]he finding of 4 unique inserts in the 2019-nCoV, all of which have identity/similarity to amino acid residues in key structural proteins of HIV-1 is unlikely to be fortuitous in nature."

122. This means that an unnatural unexpected recombination had happened, presumably in a viral research or vaccine lab, to produce the same or similar RNA

spike protein sequence manufactured, marketed, and pre-sold to the federal government by Defendants PFIZER and MODERNA as a drug or "genetic therapy" to prevent or treat COVID-19.

123. PFIZER and MODERNA sold this "genetic therapy" to the U.S. Government without knowing whether or not similar recombinations/mutations might occur as a result of the subject mRNA similarly altering other viruses residing in human bodies, such as herpes, or hepatitis, or Epstein Barr cancer viruses, risking future outbreaks.

124. Pradhan's controversial falsely-dismissed science using Watson was purportedly refuted by exclusively Li Kiu Xiao, et. al. in *Emerging Microbes & Infections* (February 14, 2020) in an article titled, "HIV-1 did not contribute to the 2019-nCoV genome." But this effort backfired to Xiao et. al.'s discredit.[5]

---

[5]     Xiao explained his findings to his local newspaper, *The El Paso Herald Post*, stating, "HIV short sequences are very common in nature . . . , and using those sequences to make the virus infect humans has no scientific basis at all."

To the contrary, Xiao's statement contradicted Xiao's science paper in which his peer-reviewed article detailed his GenBank discoveries that showed "that the top 100 identical or highly homologous hits are all from host genes of mammal[s], . . ." Mammals include monkeys, chimps, and humans. It is widespread knowledge in virology and AIDS science that HIV-1 is "highly homologous" to the Simian immunodeficiency virus from the chimpanzee (SIVcpz); and Litton chimpanzees are infamous for having been used to incubate the viruses used in the earliest hepatitis B vaccine trials in Africa and the U.S. from whence HIV/AIDS emerged.

Xiao also discredited himself and his co-authors when he was quoted as saying, "'As a structural virologist, what I have done for the paper is look at the interface between the spike protein and human ACE2.' . . . ACE2 is a cell surface molecule that serves as an entry point into human cells for SARS-CoV-2," *The Post* clarified. But both publications neglected the fact that HIV-1 also gains access into human cells by this same ACE2 receptor site!

Finally, Xiao undermined his reliability again when his team's science paper actually corroborated Pradhan/Watson's determinations. Xiao reported, "The detection of completely matched sequences of 1 and 2 insertions in only a few HIV-1 strains [compared with the COVID-19 virus] demonstrated that four insertions are very rare or not present among tens of thousands of *natural* HIV-1 sequences." (Emphasis added.)

That determination and conclusion by Xiao et. al. was virtually identical to Pradhan et. al's determination and "surprising" conclusion that although the four (4) HIV-1 attachment

125. Most disconcerting, Xiao et. al.'s publication came with gross conflicting interest that the authors concealed, much like the safety risk of the mRNA vaccines—PFIZER's long history of financing Xiao's University of Texas and cancer virus studies conducted there. These included researching enzymes active in cancer induction versus genetic repair.

126. In fact, material to COVID-19 mRNA vaccines and the HIV-1/cancer link, PFIZER financed the isolation and mass production of the first breast cancer virus called the Mason-Pfizer Monkey virus.

127. Consequently, PFIZER's defense against liability for possibly spreading certain types of cancers through contaminated lab animals, vaccines, and/or blood supplies may hinge on refuting, censoring or evading science such as what Pradhan/Watson published evidencing the huge risk to society of lab virus experiments gone awry.

128. Material here, officials have fraudulently concealed the scientific facts and high probability that the COVID-19 virus transmits like 'respiratory AIDS."

129. In advertising these companies' COVID-19 "vaccines" as safe, therefore, the HEARST media, among others, completely concealed or willfully and knowingly

---

protein sequences matched identically or substantially to the spike protein attachment assembly of SARS-CoV-2, this could not have occurred *naturally*. It had to have been engineered in a lab.

Xiao et. al., concluded to their own discredit, "This also explains why four insertion homolog sequences [in the 2019-nCoV genome] could only be independently found in different HIV-1 genomes. Because of their poor identities to and rareness in the HIV-1 sequences, HIV-1 could not be the [natural] source for those insertion sequences in the 2019-nCoV genome." In other words, the sequences had to have been spliced together as Pradhan's group surmised from the four (4) different "independently found" HIV-1 gene sequences in different parts of the spike protein, possibly sourced from different strains of HIV-1.

Xiao et. al. raised two more objections to some of the Pradhan group's conclusions, but careful analysis of these added objections shows much the same—corroboration more than refutation of Pradhan's censored and falsely discredited publication.

disregarded the substantial risk to society of injecting HIV/AIDS-like spike protein 'antigens' into people (especially those with pre-existing medical illnesses or viral infections such as the flu, or herpes, or Epstein-Barr cancer viruses).

130. Officials concealed the risk of PFIZER and MODERNA's genetic sequences recombining with other viruses in humans or the environment, increasing the risk and likelihood of additional "novel" outbreaks and disastrous pandemics.

**D. The Claimed "Safety" and "Efficacy" of Defendants PFIZER and MODERNA's "Game Changer"**

131. Largely as a result of related AIDS science, and the difficulties in developing a vaccine to combat the highly unstable (mutagenic) HIV-1 virus, on November 9, 2020, PFIZER and partner BioNTech announced a "game changer" in their fight against viruses and viral-induced diseases, with their COVID-19 mRNA-based vaccine candidate, "BNT162b2."

132. The partnered companies advertised their vaccine against SARS-CoV-2 claiming it "has demonstrated evidence of efficacy . . . a vaccine efficacy rate above 90%, at 7 days after the second dose, . . . This means that protection is achieved 28 days after the initiation of the vaccination, which consists of a 2-dose schedule."

133. These Defendants added, "As the study continues, the final vaccine efficacy percentage may vary. The DMC has not reported any serious safety concerns and recommends that the study continue to collect additional safety and efficacy data as planned. The data will be discussed with regulatory authorities worldwide."

134. On July 22, 2020, more than 3 months before PFIZER's 90% vaccine efficacy

32

announcement, the U.S. Department of Health and Human Services and the Department of Defense (DoD) "announced an agreement with U.S.-based Pfizer Inc. for large-scale production and nationwide delivery of 100 million doses of a COVID-19 vaccine in the United States following the vaccine's successful manufacture and approval.

135. The agreement also allowed the U.S. government to acquire an additional 500 million doses. . . . The Biomedical Advanced Research and Development Authority (BARDA), part of the HHS Office of the Assistant Secretary for Preparedness and Response, collaborated with the DoD Joint Program Executive Office for Chemical, Biological, Radiological and Nuclear Defense and Army Contracting Command, to provide $1.95 billion for the production and nationwide delivery of the first 100 million doses of the vaccine after EUA [Emergency Use Authorization] or licensure, with the ability to acquire up to an additional 500 million doses."

136. PFIZER detailed its testing procedure in an attachment linked to its November 9, 2020 press release. This described the trial as "a multicenter, multinational, Phase 1/2/3, randomized, placebo-controlled, observer-blind, dose-finding, vaccine candidate–selection, and efficacy study in healthy individuals." No mention of "safety" assessment is made in this "Overall Design," especially for 'unhealthy individuals.'

137. "Safety" is mentioned in the PFIZER testing protocol as follows: "The study consists of 2 parts. Phase 1: to identify preferred vaccine candidate(s) and dose level(s); Phase 2/3: an expanded cohort and efficacy part. . . . The study will

33

evaluate the safety, tolerability, and immunogenicity of 2 different SARS-CoV-2 RNA vaccine candidates against COVID-19 and the efficacy of 1 candidate [given in 2 doses (separated by 21 days)" and "At various different dose levels in Phase 1."

138. Safety measurements, according to the PFIZER/BioNTech protocol, consisted of "Unplanned Potential COVID-19 Illness Visit[s or] Convelescent Visit[s] if subjects reported any Adverse Events (AEs)." AE's were defined as "any abnormal laboratory test results (hematology, clinical chemistry, or urinalysis) or other safety assessments (eg., ECG, radiological scans, vital sign measurements). Exacerbation of a chronic or intermittent preexisting condition including either an increase in frequency and/or intensity of the condition."

## 1. The Defective Safety Trial

139. No information was provided regarding safety monitoring of genetic mutations, nor potential changes in genetic function, nor co-infecting viral recombination risks.

140. The trials did not assess the vaccine spike protein function mimicking HIV-1 and increasing transmissibility, for the high probability of prompting new diseases, like that of the never-before-seen "novel" COVID-19 SARS-coronavirus that mysteriously emerged.

141. The PFIZER protocol, in fact, makes these unknown risks unknowable by stating (on p. 72): "Genetics (specified analyses) are not evaluated in this study."

142. Furthermore, the Phase 1 procedure used "to identify preferred vaccine candidate(s) and dose level(s)" **excluded**: "Individuals at high risk for severe COVID-19, including those with: "• Hypertension • Diabetes mellitus • Chronic pulmonary disease • Asthma • Current vaping or smoking • History of chronic smoking within the prior year • Chronic liver disease • Stage 3 or worse chronic kidney disease (glomerular filtration rate <60mL/min/1.73m2) • Resident in a long-term facility • BMI >30 kg/m2 • Anticipating the need for immunosuppressive treatment within the next 6 months [such as AIDS and hepatitis patients]."

143. In other words, PFIZER's vaccine selection and dose toleration monitoring, much like MODERNA's, was not conducted on persons with those lifestyle risks and pre-existing medical conditions, leaving a gaping-hole in the provision of preventative and remedial technologies best filled by an array of anti-oxidants such as hydroxychloroquine or OxySilver™ with 528.

144. Alternatively, the Phase 3 procedure (wherein the Phase 1-selected vaccines and dose amounts were tested) permitted patients with the serious pre-existing medical conditions, and permitted the inclusion of medical patients with a history of pharmaceutically-managed HIV/AIDS and hepatitis infections, but did not study these patients for very long.[6]

---

[6]   The selected "drug substance" code named "BNT162b1" is not actually a "vaccine," but a "genetic therapy" according to PFIZER/BioNTech and *Nature* (September 30, 2020). It was shown to elicit human antibody and immune cell responses in the targeted $T_H1$ T-cell colony by specifically encoding "the trimerized SARS-CoV-2 spike glycoprotein" of the receptor binding domain called the "RBD antigen."

In simpler terms, three interconnected copies of the "spike surface glycoprotein" isolated presumably from the COVID-19 SARS-coronavirus mutant was mass produced with the understanding that duplicate copies of itself once injected would act as antigens prompting immune

145. This information did not appear in any mainstream media advertisements, nor were any PFIZER/BioNTech disclaimers on these express risks noticed publicly.

146. Instead, the Defendants disclaimed their public announcements in relevant part stating: "the BNT162 mRNA vaccine program, and modRNA candidate BNT162b2 . . . involves substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Risks and uncertainties include[d]" in the Defendants' reports were extensive, but neglected any and all potential long-term genetic repercussions risking populations through new outbreaks or viral recombinations within vaccine recipients.

147. According to the consensus of genetic scientists, one inherent risk recognized in mRNA genetic therapies is that RNA can perform general recombination of RNA strands producing new RNA sequences that may activate DNA genes to produce proteins in and around affected cells, the consequences being unknown, but potentially cancer-causing.

148. Despite the aforementioned limited COVID-19 safety protocols omitting long-term impacts on: (a) genetic function; (b) human genome mutations; (c) latent and "lenti" cancer virus recombinations; (d) potential negative impacts on

---

reactions. The virtual poisoning would subsequently prompt those injected to produce antibodies through the mRNA's impact on the subject's DNA.

Furthermore, "The antigen-encoding RNA contains sequence elements that increase RNA stability and translation efficiency in human dendritic cells." *Id.*) As simplified in *Wikipedia*, "Dendritic cells (DCs) are antigen-presenting cells (also known as accessory cells) of the mammalian immune system. Their main function is to process antigen material [in this case, the PFIZER/MODERNA mass produced] mRNA and present it on the cell surface to the T cells of the immune system."

immunological competence and disease resistance among individuals who are medically-compromised; and (e) environmental risks to emerging viruses and insect vectors, the Defendants and/or their media partners and advertisers simply publicized these vaccines will be approved by the FDA because the safety and efficacy data collected is reliable.

## 2. False Safety Assurances

149. Samples of the Defendants' advertisements and/or media representations made by the Defendants' agents in the aforementioned pharmaceutical enterprise are provided in the following pages, showing subtle to more obvious safety assurances and/or persuasive messages conditioning the public to trust the safety of the PFIZER and MODERNA COVID-19 vaccines in anticipation to their "Warp Speed" approval by the FDA.

150. Examples of false and misleading statements made by Defendants' advertisers, including government officials, in the samples reprinted below include:

a) Dr. Fauci on WebMD stated his confidence that the PFIZER vaccine would reach the "required safety milestone" which is a bar that Fauci knew was set so *low* that it neglected "Genetics (specified analyses)" "not evaluated in this study," according to the trial Protocol that Fauci undoubtedly was required to read prior to making that statement.

b) "We look forward to sharing additional efficacy and safety data generated from thousands of participants in the coming weeks" Anthony Bourla falsely and misleadingly stated knowing that the company had not yet released any "safety data" to the media.

c) Mr. Bourla and his media also neglected to disclose that the vaccine

37

recipients were the ones first and foremost monitoring and recording without medical training the adverse events ("AEs") over the short term, and not long-term whereby even if recipients developed diseases (i.e., severe adverse events or "SAEs") no one could certifiably ascribe 'cause-and-effect.' Thus, Mr. Bourla's statement of "sharing addition safety data in the coming weeks" is a material misrepresentation. Thus, the statement implies the safety of the vaccine produced by the company that was not known at that time, nor might ever be learned under the limited "safety protocol."[7]

d) The PFIZER websites's advertisement deceptively states: "we are committed to helping keep people safe" yet fails to encourage readers to boost their natural immunity using widely available nutritional anti-oxidants.

e) NBC News published a feature article on November 23, 2020 targeting Blacks, headlined: "Black doctors endorse taking 'safe and effective' COVID-19 vaccine" despite having no actual knowledge the subject vaccines were safe. "Respect for our Black bodies and our Black lives must be a core value for those who are working to find the vaccine," the PFIZER-partnering network advertised.

f) iHeart Radio also advertised falsely Albert Bourla's statement on November 20, 2020, "[W]e now have a more complete picture of both the efficacy and safety profile of our vaccine. . ." To be accurate, the incomplete picture of both the efficacy and safety profiles were fraudulently concealed by Bourla and the Defendants' allied advertisers.

---

[7] Florida law recognizes that fraud can occur by omission, and places on one who undertakes to disclose material information a duty to disclose that information fully. *Gutter v. Wunker,* 631 So.2d 1117, 1118-19 (Fla. 4th DCA 1994), cited in *Pitts Sales, Inc. v. King World Productions, Inc.*, 383 F. Supp. 2d 1354 - Dist. Court, SD Florida 2005.



# Pfizer and BioNTech say final analysis shows coronavirus vaccine is 95% effective with no safety concerns

By Maggie Fox and Amanda Sealy, CNN

Updated 12:53 PM ET, Wed November 18, 2020



**(CNN)** — A final analysis of the Phase 3 trial of Pfizer's coronavirus vaccine shows it was 95% effective in preventing infections, even in older adults, and caused no serious safety concerns, the company said Wednesday.

The company counted 170 cases of coronavirus infection among

 ≡   *Web*MD   SIGN IN   SUBSCRIBE   SEARCH

ADVERTISEMENT

Immune support so your whole family can thrive.    ZARBEE'S   AdChoices ▷ 

# Fauci Will Take an Approved Pfizer COVID Vaccine



November 12, 2020 -- If the new coronavirus vaccine developed by Pfizer is approved by the FDA, Anthony Fauci, MD, the director of the National Institute of Allergy and Infectious Diseases, said he will take it.

Fauci added that he trusts Pfizer and the FDA and has confidence in the vaccine's approval.

"I'm going to look at the data," he told MSNBC on Tuesday. "But I trust Pfizer. I trust the FDA."

On Monday, Pfizer and BioNTech announced that their vaccine candidate has 90% efficacy and appears to keep 9 out of 10 people from getting COVID-19. The companies plan to submit data to the FDA for emergency use authorization as soon as clinical trials reach the "required safety milestone," which is expected to occur in the third week of November.

"We look forward to sharing additional efficacy and safety data generated from thousands of participants in the coming weeks," Anthony Bourla, the CEO and chairman of Pfizer, said in a statement.

An external, independent Data Monitoring Committee examined the data on Nov. 8, the companies said. Now scientists at Pfizer will look at the data and analyze it, Fauci told MSNBC, which will then go to the FDA, where independent scientists will review the data and consult their own an advisory committee about whether to allow the vaccine to be used. .



**NEWS**    2020 ELECTION    CORONAVIRUS    U.S. NEWS    OPINION    BUSINESS    WORLD

# Black doctors endorse taking 'safe and effective' Covid-19 vaccine

"Respect for our Black bodies and our Black lives must be a core value for those who are working to find the vaccine," a group of Black doctors wrote in an open letter.



Nov. 23, 2020, 12:40 PM EST

**By Randi Richardson**

Eight prominent Black doctors wrote a "love letter to Black America" to encourage people to get the Covid-19 vaccine once it becomes available.

A significant proportion of Black Americans said in an Axios/Ipsos poll in August that they were unlikely to get the first-generation

iHeartRADIO   **Upgrade**   For You   Your Library   L

# Pfizer To Apply For Emergency Authorization For Their COVID-19 Vaccine

By Ryan Shepard
November 20, 2020

  

15



"Our work to deliver a safe and effective vaccine has never been more urgent, as we continue to see an alarming rise in the number of cases of COVID-19 globally," Pfizer CEO **Albert Bourla** said.

"Filing in the U.S. represents a critical milestone in our journey to deliver a COVID-19 vaccine to the world and we now have a more complete picture of both the efficacy and safety profile of our vaccine, giving us







# Learn to Safely Reopen Your Practice

Reopening for business means reopening safely. To ensure it is safe for your community to reopen, the White House has established three gating criteria your community must meet. Once meeting the criteria—related to reported coronavirus symptoms, cases, and hospital-care incidents—reopening will occur in phases, prioritizing business posing the lowest risk of infection for their employees and customers.

Phase One allows medical practices in states and regions satisfying the gating criteria to resume providing non-emergent surgical, chronic disease, and preventive care—but only as clinically appropriate, and on an outpatient basis, at

## Reopen with Confidence and Compliance

We can help you navigate the rules and protocols for safely reopening your practice. To connect with one of our sales consultants, please fill out the form below.

Name *

 

ADVERTISEMENT

Immune support so your whole family can thrive.  

## Pfizer Starts Clinical Trials of COVID-19 Vaccine

By Kathleen Doheny



May 7, 2020 - Today in the world of coronavirus news –

Pfizer has launched a phase I/II clinical trial for a vaccine for COVID-19. It is collaborating with an immunotherapy company, BioNTech, and testing four different vaccine candidates at once, the company says.

It expects to produce millions of vaccine doses yet in 2020.

The platform under study is similar to the one used by Moderna, which hopes to begin a phase II study by the summer.

According to Pfizer, the dosing of the first group of volunteers was done in Germany last week. Stage 1 of the phase I/II trial in the U.S. will enroll up to 360 healthy people in two age groups, 18-55 and 65-85. Older adults will be immunized once a safe a dose level is established. Sites include NYU and the University of Maryland. Enrollment is scheduled to begin at the University of Rochester and Cincinnati Children's Hospital soon.

These types of vaccines use messenger RNA to convey genetic information to the body's cells. Once mRNA in a vaccine is in the cell, the cells can translate this genetic information to create an immune response.

i) A May 7, 2020 WebMD article deceptively stated: "According to Pfizer, . . . [o]lder adults will be immunized once a safe dose level is established. Sites include NYU. . . ." In fact, the purported "safe dose level" allegedly to be established by NYU et. al. along with the number and amount of vaccines required based on the "phase I/II trial" precluded elderly citizens with pre-existing medical conditions, and therefore subsequent injections in this group had no valid scientific bases upon which to inform such persons adequately regarding their safety in taking the mRNA vaccines.

151. The PFIZER and MODERNA COVID-19 testing protocols especially precluded patients with pre-existing medical conditions, HIV and hepatitis B infections, and lifestyle risks of cigarette smoking and vaping during the Phase 1 and Phase 2 trials in which dose tolerance and number of injections was established.

152. Given the aforementioned restricted knowledge and restricted involvement of human subjects with pre-existing medical conditions and lifestyle risks, the advertisers could not assure COVID-19 vaccine safety. Nor did they address the potential long-term impacts on these patients' whose illnesses might be aggravated by the mRNA injections potentially causing death proximal to the genetic challenge, all presumably dismissed as unprovable or 'unlikely.'

153. This deficiency is especially noteworthy due to the pattern-and-practice of these Defendants and their advertisers' cases of alleged fraud, litigating for years in denial of toxic reactions and deadly outcomes from their consumables.

154. Consequently, pursuant to safety representations and insinuations, especially in these experimental groups at heightened risk, the omission of public information by the Defendants regarding these risks hinders 'informed consent.' Across the population, citizens may be subjected to unprecedented risks, especially because these are not typical "vaccines." The MODERNA and PFIZER vaccines are openly acknowledged "genetic therapies" upon which no general agreement or even scientific consensus has been, or even can be, established at this time or perhaps any time during the coming years.

**E. BioPharma and FDA Misapprehended Representations**

155. On September 8, 2020, "BIOPHARMA LEADERS" issued a false and misleading joint press release making the following representations to assure the public of the safety of the COVID-19 vaccines:

> The safety and efficacy of vaccines, including any potential vaccine for COVID-19, is reviewed and determined by expert regulatory agencies around the world, such as the United States Food and Drug Administration (FDA). FDA has established clear guidance for the development of COVID-19 vaccines and clear criteria for their potential authorization or approval in the US. FDA's guidance and criteria are based on the scientific and medical principles ***necessary to clearly demonstrate the safety and efficacy of potential COVID-19 vaccines***. More specifically, ***the agency requires that scientific evidence for regulatory approval must come from large, high quality clinical trials*** that are randomized and observer-blinded, with an expectation of appropriately designed studies with significant numbers of participants across diverse populations. (Emphasis added.)

156. In contrast to these misrepresentations, not valid misapprehensions, the FDA **does not** "***clearly demonstrate the safety and efficacy of potential COVID-19 vaccines.***" That work is left to the drug makers, as can be known by the FDA's issued and standard notice of 2011 that continues to the time of this filing. It states in relevant

46

parts:

- The United States' long-standing vaccine safety system ensures that *vaccines are as safe as possible. As new information and science become available, this system is, and will continue to be, updated and improved.*
- The U.S. Food and Drug Administration (FDA) ensures the safety, effectiveness, and availability of vaccines for the United States. *Before the FDA licenses (approves) a vaccine, the vaccine is tested extensively by its manufacturer. FDA scientists and medical professionals carefully evaluate all the available information about the vaccine [provided by the drug developer] to determine its safety and effectiveness.*
- Although most common side effects of a vaccine are identified in studies before the vaccine is licensed, *rare adverse events may not be detected in these studies. Therefore, the U.S. vaccine safety system continuously monitors for adverse events (possible side effects) after a vaccine is licensed. When millions of people receive a vaccine, less common side effects that were not identified earlier may show up.*

**Prelicensure:** Vaccine Safety Testing |The U.S. Food and Drug Administration (FDA) must license (approve) a vaccine before it can be used in the United States. *FDA regulations for the development of vaccines ensure their safety*, purity, potency, and effectiveness. *Before a vaccine is approved by FDA for use by the public, results of studies on safety and effectiveness of the vaccine are evaluated by highly trained FDA scientists and doctors.* FDA also inspects the vaccine manufacturing sites to make sure they comply with current Good Manufacturing Practice (cGMP) regulations. (Emphasis added.)

157. Accordingly, the FDA will not be checking for "Genetics (specified analyses)" "not evaluated in this study" if and when it certifies the COVID-19 vaccine's "safety."

158. Nor will the long-term medical and hereditary consequences be known; nor the potential impact on future generations.

**F. Tortious Interference by Coordinated Censorship Accommodating Defendants' Unfair and Deceptive Trade**

159. On-or-about August 9, 2020, Facebook terminated the Plaintiff's account that had been engaged by 5,000 subscribers after HOROWITZ exposed the safety risks associated with Johnson & Johnson's COVID-19 vaccine prepared with altered

adenovirus "vectors" derived from monkey or gorilla feces.

160. On November 16, 2020, Robert F. Kennedy, Jr.'s Children's Defense Fund published an article detailing the declaration of "cyber war" in the U.S. and U.K. to "quash vaccine hesitancy" by 'neutralizing' publishers voicing concerns about the safety of COVID-19 vaccines in preparation for mass inoculations.

161. The Kennedy article referenced a related publication in *The Guardian* that stated: "America's 'anti-vaxxer movement' would pose a threat to national security in the event of a 'pandemic with a novel organism,' an FBI-connected non-profit research group warned last year, just months before the global coronavirus pandemic began."

162. That statement, being contemporaneous with the October 2019 Event 201 coronavirus pandemic "exercise," further evidences a coordinated commercial enterprise that includes the military and intelligence communities in committing Constitutional violations against the class of citizens, including religious persons, all smeared as "anti-vaxxers."

163. The un-American covert counter-intelligence program was allegedly administered by the CIA and Britain's GCHQ in efforts "to silence independent journalists who raise legitimate concerns over pharmaceutical industry corruption or the extreme secrecy surrounding state-sponsored COVID-19 vaccination efforts, now that Pfizer's vaccine candidate is slated to be approved by the U.S. Food and Drug Administration (FDA) by month's end," *The Guardian* reported.

164. On January 22, 2020, as fears of COVID-19 were exploding along with

media interest in PFIZER and MODERNA's mRNA vaccines, the leading

organization influencing media censorship and pro-vaccination propaganda, the

Poynter Institute, received a large financial investment from Facebook.

165. This partnership developed the MediaWise Voter Project acting to influence

young minds, especially among minority populations.

166. MediaWise advertised itself as "a digital information literacy initiative led by

the Poynter Institute in partnership with the Stanford University . . . and funded by

Google.org (2018-2020)."

167. The expressed purpose of this enterprise is to "teach 1 million American

teenagers to tell fact from fiction online with half coming from underserved or

low-income communities."

168. In the domain of vaccinology, this pharmaceutical enterprise, or alleged

'protection racket,' discredits vaccine 'hesitancy' and spins facts to develop a

'general consensus' or 'general agreement' of the safety and efficacy of vaccines

despite the censorship of alternative science; and despite such critics and

'skeptics' publications being laden with serious omissions and misrepresentations.

169. The objective and impact of this mass persuasion enterprise establishes the

consensus upon which regulatory and legal policies impacting the pharmaceutical

industry may be influenced under the precedent established in *Jacobsen v.*

*Massachusetts* 197 U.S. 11 (1905). "A common belief, like common knowledge,

does not require evidence to establish its existence, but may be acted upon without

proof by the legislature and the courts. . . ."[8]

170. These facts, therefore, raise critical questions of law and fact impacting public health, public safety, and public policy.

171. On November 17, 2020, the U.S. Senate Judiciary Committee grilled Facebook and Twitter CEOs, Mark Zuckerberg and Jack Dorsey, respectively, pursuant to anti-trust and political censorship activities exceeding their licenses. Sen. Josh Hawley asked Mr. Zuckerberg (@ 2:45:56) "I want to start by talking about an internal platform called 'Tasks' that Facebook uses to coordinate projects, including censorship. . . . Facebook censorship teams communicate with their counterparts at Twitter and Google [with . . .] censorship input from Google and Twitter as well. . . . "effectively coordinating their censorship efforts. . . . Mr. Zuckerberg, let me just ask you directly under oath now, does Facebook coordinate its content moderation policies or efforts in any way with Google or Twitter?"

_____

[8] The presumption established from *Jacobsen*, encouraging the Defendants' pharmaceutical-favoring social-engineering enterprise that depends on the media and mass persuasion encouraging vaccinations, in the words of the Supreme Court, actualizes "[t]he common belief . . . that [vaccination] has a decided tendency to prevent the spread of this fearful disease and to render it less dangerous to those who contract it. While not accepted by all, it is accepted by the mass of the people, as well as by most members of the medical profession. It has been general in our State and in most civilized nations for generations. It is generally accepted in theory and generally applied in practice, both by the voluntary action of the people and in obedience to the command of law. Nearly every State of the Union has statutes to encourage, or directly or indirectly to require, vaccination, and this is true of most nations of Europe. . . ."

A distinguishing cause of action in this case does not contest the value of vaccinations that may be unsafe, but rather the deprivation and obstruction of free trade precluding public knowledge and use of safer alternative products, such as with OxySilver[TM] with 528, whereas the general acceptance or 'common belief' of beneficial utility is disparaged, concealed, and discouraged unlawfully.

172.  Zuckerberg admitted (02:47:11), "Senator, we use the Task system . . . for people coordinating all kinds of work across the company. . . . We do coordinate on and share signals on security related topics. . . ."

173. Sen Hawley continued, "I'm talking about content moderation, I'm talking about individuals, websites, hashtags, phrases to ban. . . . How many items on the Task platform reflect that Facebook, Twitter, and Google are sharing information about websites or hashtags or platforms that they want to suppress? . . . Senator Cruz and Senator Lee both asked you for lists of individuals, websites, entities that have been subject to content moderation. . . . Mr. Zuckerberg, tell me about Sentra. What is the Facebook internal tool called Sentra? . . . Mr. Zuckerberg, how many accounts in the United States have been subject to review and shut down through Sentra?

174. Mr. Zuckerberg refused to answer, or said he did not know the answer, and would need to research the answers and get back to Sen. Hawley.

175. Senator Ernst continued the interrogation (@ 03:34:28). He asked Mr. Zuckerberg, "Do you have concerns about your ability to monitor disinformation . . ." Mr. Zuckerberg replied, "In terms of assessing what is misinformation, I think it's important that we don't become the deciders on everything that is true or false ourselves, which is why we've tried to build a program of independent fact checkers that we can work with on this, and those fact checkers are accredited not by us but by the *independent* **Poynter Institute** for journalism as part of the international fact-checking network, . . ." (Emphasis added.)

176. This 'new discovery' of Facebook's reliance on the "Poynter Institute," and aforementioned publishing operations of the McCrystal Group/Crosslead/First Data/KKR/WebMD etc, all targeting, smearing, and censoring vaccination risk analysts and public protection advocates, compounds evidence of the Defendants' leadership within the alleged 'pharmaceutical syndicate' and 'protection racket' committing multiple torts and crimes (including unfair and deceptive trade) under the guise of 'public health,' U.S. National Security, and "Section 230" that protects the alleged racket against liability.

177. On February 1, 2019 the Poynter Institute made known that "Snopes.com," an entity that had also libeled HOROWITZ in 2016 by misrepresenting the Plaintiff's research and publications to discredit both, acted as the "fact-checker" for Facebook as well as Poynter.

178. Facebook paid Snopes.com $100,000.00 "for participating in the partnership" Poynter revealed.


## VI. CLAIMS

### COUNT I

**VIOLATION OF
Florida's Deceptive and Unfair Trade Practices Act (FDUTPA)
Stat. § 501.202 (based on the FTC ACT 15 USC §45)**

### Making False Claims of "Safety"

179. Plaintiff realleges and incorporates the allegations of Paragraphs 1 through 38 (identifying the Parties' interests) and 145 and 150 (pursuant to alleged false

claims of "safety") as though fully set forth herein, and sues all Defendants for violations of FDUTPA and the FTC Act.

180. Stat. § 501.202 (and FTC Act, 15 U.S.C. § 52) prohibits "unfair or deceptive acts or practices in or affecting commerce."

181. In order for a consumer to claim damages under FDUTPA, they must prove three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006).

182. A plaintiff must not only prove that the conduct complained of was unfair, unconscionable, or deceptive, but also that it suffered actual damages, proximately caused by the unlawful conduct. *In re Florida Cement and Concrete Antitrust Litigation*, 746 F. Supp. 2d 1291, 1321 (S.D. Fla. 2010).

183. Alternatively, if a consumer is seeking injunctive relief, instead of damages, the consumer is not required to prove the deceptive act or unfair practice caused a loss. Fla. Stat. § 501.211(1); *see also Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1365-66 (S.D. Fla. 2010).

184. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by the FDUTPA.

185. FDUTPA and the FTC Act prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics.

186. For the purposes of FDUTPA and the FTC Act, PFIZER and MODERNA COVID-19 vaccines are classified as "drugs," while the Defendants refer to them as "genetic therapies."

187. Despite PFIZER and MODERNA referring to their mRNA COVID-19 "vaccines" as "genetic therapies" their Phase 1, 2 and 3 safety and efficacy protocols and trials omit/neglect any analysis of the genetic impact, acute or long-term, of injecting the messenger RNA (mRNA) trivalent molecule largely comprised of AIDS-virus spike-protein genes into human bodies. Again, the PFIZER protocol states (p. 72): "Genetics (specified analyses) are not evaluated in this study."

188. This defect in the study design coupled with false advertisements conceals risks of the mRNA "genetic therapy" being intertwined with four scientifically-determined genes (proximal to those of HIV-1/AIDS in the spike protein assembly of the pandemic SARS-coronavirus recombinant according to Pradhan et. al.) that may cause genetic mutations defrauds consumers whose 'informed consent' is precluded by the material concealments.

189. Defendant PFIZER misrepresented, directly and expressly, that the PFIZER mRNA vaccine trials showed "no serious safety concerns." This advertisement was published without examining genetic function, or even long-term genetic alterations in humans, genetic recombinations of viruses, or genetic illnesses that are likely to result from the "genetic therapy" to the test subjects, and potentially even their offspring.

190.  Defendants have misrepresented expressly or by implication, directly or indirectly through their agents or advertisers, that the PFIZER/MODERNA mRNA vaccine trials:

191. **A.** showed "no serious safety concerns;" whereas the PFIZER and MODERNA protocols neglected the reasonable genetic safety studies required to assure the public that injecting mRNA and its expected impacts on host DNA is "safe";

192. **B.** neglected quantifying anticipated genetic alteration(s) or stimulation(s) of lentiviruses residing in humans (i.e., latent RNA tumor viruses with long incubation periods, like HIV/AIDS 'retroviruses,' or other viruses that may cause damaging genetic expressions when DNA becomes impacted or infected;

193. **C.** neglected medically-compromised people who were precluded from Phase 1 of the trails that established the dosage, number of injections, and timing of the injections; thus (without such data) mass vaccinations impacting these populations at higher risk of illness precludes providing valid safety assurances; neglecting acquiring valid 'informed consent' from study participants due to the aforementioned neglect; and

194. **D.** misrepresented the vaccines as having been proved 'safe enough' for the FDA to certify, prompting mass distribution of the vaccines represented as having "no serious safety concerns."

195. The representations set forth in Paragraphs 68 thru 69 are false or misleading, or were not substantiated at the time the representations were

made; and therefore the making of the representations as set forth in Paragraph 150 of this Complaint constitutes a deceptive act or practice; and the making of false advertisements inferring these vaccines' "safety" in or affecting commerce, violates FDUTPA and the FTC Act.

**CONSUMER INJURY**

196. Consumers have suffered and will continue to suffer injuries as a result of Defendants' false safety assurances in violation of the FTC Act.

197. At this early time, PFIZER and MODERNA have reported mild injuries to vaccine trial subjects. Substantial injuries, however, are anticipated.

198. In addition, Defendants have been unjustly enriched as a result of their false statements or advertisements inferring the safety of the MODERNA and PFIZER COVID-19 vaccines.

199. Absent injunctive relief by this Court, Defendants are likely to continue to defraud and injure consumers, reap unjust enrichment, harm the public interest, and also damage, dominate, and destroy competitors' commerce.

## COUNT II

**VIOLATION OF**
**Florida's Deceptive and Unfair Trade Practices Act (FDUTPA)**
**Stat. § 501.202 (based on the FTC ACT 15 USC §45)**

**Failure to Disclose Material Connections with Endorsers**

200. Plaintiff realleges and incorporates the allegations of Paragraphs 27; 36-41 and 81-112 (identifying the Parties' interests and endorsers), and 136 through 158

56

(pursuant to the endorsers making false claims or insinuations of "safety") as though fully set forth herein.

201. In numerous instances in connection with the advertising, marketing, promotion, and offering for sale the subject vaccines to the federal government and to private companies and persons, Defendants have represented, directly or indirectly, expressly or by implication, that the vaccines are endorsed by highly-regarded medical doctors, and/or well-informed government officials. The PFIZER and MODERNA COVID-19 vaccine advertising cited in Paragraphs 136 through 158 reflect such deceptive opinions.

202. In numerous instances in which Defendants have made the safety representations set forth in Paragraphs 136 through 158 of this Complaint, the Defendants have failed to disclose, or disclosed inadequately to consumers, that the consumer endorsers appearing in their advertising had material connections and/or conflicting interests in the Defendants' enterprise.

203. Specifically, Defendants PFIZER and MODERNA did not disclose that the consumer or government endorsers were compensated in connection with their endorsement, or received pecuniary benefits from their endorsements; and some of the consumer or governmental endorsers were investors, stockholders, co-owners, co-patent-holders, or professionally and/or commercially associated with other employees, owners, or major stockholders in PFIZER and/or MODERNA.

**A. Dr. Fauci: A Prime Example**

204. A prime example is Dr. Anthony Fauci, seen promoting the PFIZER vaccine as shown in Paragraph 150, Dr. Fauci is identified in the advertisement as a leading governmental endorser of PFIZER and MODERNA vaccines.

205. Dr. Fauci is also a co-patent holder on technology that may very well be used by MODERNA that is in the business of manufacturing mono-clonal antibodies, and vaccines that target cells to produce those antibodies, that may be used to fight HIV/AIDS and COVID-19.

206. Dr. Fauci's Patent number: 6911527, regards "HIV related peptides" involved in the manufacturing and therapeutic utility of the PFIZER and MODERNA COVID-19 vaccines, as detailed in Paragraphs 120 thru 124, and below in Paragraphs 208 thru 215.

207. Moreover, although Dr. Fauci denies or conceals these facts, he is well aware that the COVID-19 virus is widely recognized in the scientific community as being a "lab virus" recombinant, (what Dr. Fauci has called a "reassortment") that is highly transmissible because it contains four (4) genes from the AIDS virus that comprise a large part of the attachment protein called the "spike protein" or "S protein."

208. Much like Dr. Fauci concealed his conflicting commercial interests as a co-patent holder in this technology, he has similarly concealed the COVID-19 virus and disease's relationship to HIV/AIDS science foundational to PFIZER and MODERNA's mRNA vaccines that target immune cells using the same or similar "spike protein" comprised substantially of HIV-1 genes (as addressed in Paragraphs 104 thru 106).

209. Moreover, the way in which PFIZER and MODERNA's COVID-19 vaccines work is by using those same four (4) gene sequences in the "spike protein" similar to the way HIV-1 works in the disease transmission system.

210. Additionally similar is the way in which PFIZER and MODERNA's mRNA vaccines work by attaching to the same ACE2 receptor site in the human immune cell that HIV-1 attaches to using the very similar S protein.

211. Evidencing conflicting interests, Dr. Fauci's patent Abstract reads:

> This invention is the discovery of novel specific epitopes [i.e., surface antigen such as  the "S protein"] and antibodies associated with long-term survival of HIV-1 infections. These epitopes and antibodies have use in preparing vaccines for preventing HIV-1 infection or for controlling progression to AIDS.



Platform: LNP-encapsulated mRNA  encoding S protein.

212. The same may be said of PFIZER's and MODERNA's mRNA vaccines.

213. A recent series of studies at MODERNA proved promising using the same mRNA approach used to combat HIV/AIDS. "[W]hat Moderna is attempting to do is to devise a vaccine that 'educates' the immune system to recognize both the broadest possible number of variants of HIV, and the parts of them that are most universal," MODERNA explained.

214. Finally, in-so-far-as conflicting interests defrauding the public, Dr. Fauci directed the National Institute for Allergies and Infectious Diseases ("NIAID") that largely funded MODERNA's novel mRNA vaccine research and developments.

215. In summary, Dr. Fauci holds several concealed conflicting interests as an individual who is covertly compensated for endorsing the subject vaccines by speaking at conferences and through the media, benefitting all of the Defendants.

216. Furthermore, it is public knowledge that additional financing for MODERNA's research and vaccine development has come from the MicroSoft charity, The Bill & Melinda Gates Foundation, with MicroSoft being the "MS" in MSNBC that Paragraphs 111 thru 112 and 186 ties not only to the coronavirus predictive programming "Event 201," but also to NBC/Comcast allied with HEARST and MSNBC's safety misrepresentations.

217. These facts would be material to consumers in evaluating media messaging and officials' endorsements for COVID-19 vaccines in connection with state and federal governments' policies, and/or decisions to receive or purchase these products.

218. Defendants' failure to disclose or disclose adequately the material information described in Paragraphs 139 thru 154, above, in-light-of the false safety representations described in Paragraphs 136 thru 158 above, constitutes a deceptive act or practice in violation of FDUTPA and the FTC, 15 U.S.C. § 45(a).

**CONSUMER INJURY**

219. Consumers have suffered and may suffer more substantial injuries as a result of Defendants' false safety messaging broadcast by endorsers with concealed conflicting interests, in violation of the FTC Act.

220. In addition, Defendants have been unjustly enriched as a result of advertising and inferring safety of the MODERNA and PFIZER COVID-19 vaccines without valid science.

221. Absent injunctive relief by this Court, Defendants are likely to continue to defraud and injure consumers by this tort, and reap unjust enrichment, harm the public interest, and also damage, dominate, and destroy competitors' commerce.

## COUNT III

### VIOLATION OF
### Florida's Deceptive and Unfair Trade Practices Act (FDUTPA)
### Stat. § 501.202 (based on the FTC ACT 15 USC §45)

### Making False Claims of COVID-19 Vaccine "Efficacy"

222. Plaintiff realleges and incorporates the allegations of Paragraphs 1 through 38 (identifying the Parties,' advertisers, and endorsers), and 27; 36 thru 41 and 131 thru 138 (pursuant to the Defendants' and endorsers' false claims of "efficacy") as though fully set forth herein.

223. Additionally deceptive is the widely publicized promotions that the PFIZER "[v]accine candidate was found to be more than 90% effective in preventing COVID-19 in participants without evidence of prior SARS-CoV-2 infection in the first interim efficacy analysis."

224. In fact, according to the published PFIZER protocol and press release, the "first interim efficacy analysis" occurred "at 7 days after the second dose. This means that protection is achieved 28 days after the initiation of the vaccination, which consists of a 2-dose schedule. As the study continues, the final vaccine efficacy percentage may vary."

61

225. HEARST and Defendants' endorsers, including their intertwined advertisers and alleged "propaganda mills" (as detailed in Paragraphs 79 thru 98), omitted the *disclaimer* that "the final vaccine efficacy percentage may vary."

226. Moreover, HEARST and its privies-in-interest deceptively misrepresented the "efficacy rate of 90 percent" by publishing "Pfizer then analyzed the 94 cases [of "patients contracting COVID-19" after being vaccinated during the trial] to determine who was given the vaccine versus the placebo to come up with an efficacy rate of 90 percent."

227. That statement is confusing and questionable, because assuming 94 patients had received either the vaccine or placebo before testing COVID-19 positive, that could mean that the vaccine: (a) dramatically precludes the main objective of developing 'herd immunity'; (b) individuals receiving salt-water placebo remained viable spreaders of the virus; and (c) the vaccine is a costly and risky intervention that at best delays herd immunity increasing the risk of killing weak, frail and medically-compromised elders.

228. Further, this statement says nothing about the risk of those positive test subjects in the mRNA group becoming chronically ill, or suffering relapses after recoveries from natural exposures.

229. The statement, therefore, does not reflect actually "efficacy," and is deceptive even if the vaccine worked as reported.

230. In addition, the admitted neglect of genetic safety studies occurred even though the therapeutic "efficacy" prompts DNA production of spike protein antigens to induce antibody production demonstrating DNA modulation and genetic trickery.

## CONSUMER INJURY

231. Consumers have suffered and will continue to suffer mild to substantial injuries as a result of Defendants' false efficacy advertisements in violation of the FTC Act and the objective of achieving "herd immunity" to save lives.

232. In addition, Defendants have been unjustly enriched as a result of their deceptive advertising inferring the 90%+ efficacy of the MODERNA and PFIZER COVID-19 vaccines.

233. Absent injunctive relief by this Court, Defendants are likely to continue to defraud and injure consumers, reap unjust enrichment, harm the public interest, and also damage, dominate, and destroy competitors' commerce, including the Plaintiff's OxySilver$^{TM}$ with 528 sales of value to medicine, free-and-fair trade, natural therapeutics, consumer health, public safety, and medically-compromised persons who cannot, or should not, get vaccinated.

## COUNT IV

### VIOLATION OF
**Florida's Antitrust Act and/or Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) Stat. § 501.204 (based on the FTC ACT 15 USC §45)**

### Unfair Competition

234. Plaintiff realleges and incorporates the allegations of Paragraphs 1 through 38 (identifying the Parties,' advertisers, and endorsers), and 49; 72-79; and 84 thru 111 (pursuant to the Defendants' unfair competition in efforts to monopolize healthcare) as though fully set forth herein.

235. This cause of action is brought pursuant to Fla. Stat. § 501.204 that prohibits: "(1)   Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . ."

236. The FTC Act prohibits acts or practices that violate the standard for "unfairness" as may be found where they cause, or are likely to cause, "substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."

237. The Plaintiff is a health science scholar and entrepreneur who has pioneered a line of consumer products that compete directly against the Defendants' drug, vaccine, or medical enterprise.

238. The Plaintiff is also a whistleblower opposing the Defendants alleged wrongdoings.

239. The Plaintiff pioneered scientific research and therapeutic developments in the exploding fields of acoustic and photodynamic therapies (using sound and light frequencies) affecting DNA and biology competing against the Defendants' allopathic/medical paradigm in theory and practice.

240. As soon as the Plaintiff/whistleblower came to national renown in 2008 for his AIDS-origin and vaccine transmission discoveries, the Defendants' agents and enterprise acted to damage his professional reputation, religious convictions, family, friends, and businesses.

241. Within hours of Plaintiff gaining national attention from CNN broadcasting his honorable mention by President Barack Obama's spiritual/religious counsel, Rev. Jeremiah Wright, in opposition to "vaccination genocide" disproportionately damaging people of color, *Wikipedia* removed the Plaintiff's biography and the Defendants' agents and Internet regulators commenced a well-orchestrated attack

to 'neutralize' the Plaintiff by cyber-stalking and libeling him online as shown on the following page example that Google refused to block. Similar smearing continues to the time of this filing.

242. The Defendants' agents and enterprise acted unlawfully, damagingly, and unfairly in these ways favoring the Defendants' drug and vaccine enterprise, and protecting their special interests from scrutiny, liability and lost profits.

243. HOROWITZ's media interviews and business relationships dwindled as agents allied with the Defendants disparaged the Plaintiff, smeared his spiritual/religious convictions, contested his scholarship, published sham product reviews, berated his services, damaging the Plaintiff's commerce and free and fair trade.

244. For example, the Plaintiff's online product sales of OxySilver$^{TM}$ with 528 plummeted from approximately $1 million annually between 2008 to 2010, to less than $200,000.00 in 2011 and thereafter.

245. Unfair competition caused HOROWITZ's other products to lose sales as well.

246. Several of the Defendants' agents and agencies committing these acts of unfair trade were identified beginning in 2011, and in 2016 and 2018 links to HEARST were discovered, including its media partners, or major institutional stockholders, including Poynter Institute agents in the McChrystal Group, Crossleads, Snopes.com, The Skeptic Dictionary/Wiley & Sons, Google/YouTube, Facebook, Vimeo.com, and Wikipedia, each of which censored the Plaintiff or published, republished, or permitted disparaging articles about the Plaintiff/whistleblower to restrain his celebrity and trade.

Saturday, March 24, 2012

# OH, THE HORROR, THE HORROR...
# THE HORRORWITCH

Just when you think things can't get any crazier with the edomite bopsie twins, something new comes along to push the envelope a bit more and leave us all speechless.

After publishing a bogus *"criminal complaint filed with the FBI"* in which the deranged and incoherent Len Horowitz levies a rambling series of baseless allegations without any substance whatsoever against a number of highly credentialed and reputable truthful researchers - *and myself*, he has now become the Webster's Dictionary poster boy for the word **psychopath** by mailing a treatise of a document around to a list of some 20 or so people, calling them defendants in a case which as a pro-se litigant he has apparently filed with his district superior court.

I spend a lot of time exposing AJ for his edomite and stratfor connections, but in this one instance I do support him as he along with everyone else on this list is now a subject of unwarranted and harassing attacks from the cracked out narcissistic werewolf-shapeshifting edomite agent-provocateur dentist-who-calls-himself-a-doctor "Purple Gang" Len Horowitz.

All I can say is, wait until Bill Deagle and Alex Jones hear about *this* one, they're gonna hit the **roof**.

Seems to me this is a desperate act from a cornered individual who is just losing it, pulling a VT-like shooting spree in the act of filing false charges against a large group of others, and in doing so he may have just pissed off enough people for them to want to band together and take decisive action.  Kinda the way a suicidal shooter goes on a rampage then points the gun at the cops prompting them to take him out *[aka "suicide by cop"]*, I think a strong analogy exists with Len's behavior here and a similar endgame scenario will likely present itself to this crazed and dangerous lunatic.

*Stay tuned, this story will continue as I get more info.*

Sold Out

Weather and EMWs
Electro-magnetic
Weapons

AIRCRAP.ORG

Greek Activists
Demand
Government Order a
Stop to Chemtrail
Aerosol Pollution

Heavy Chemtrails --
CA, NW US, and
Mexico

Passenger Captures
Video of Chemtrails
Sprayer From Inside
Commuter Jet

A New Focus and
some Tactical
Advice concerning
our Upcoming
Actions

Not In Our Name

"A New
Reformation"

Breaking News:
Another independent
search for native
children's remains
begins in Ontario,
Canada -- and more
revelations and
attempted sabotage
at the Mohawk
Indian residential
school inquiry

Kevin Annett's New
York City Tour:
February 26 -- March
2

From: The Blogger Team <removals@google.com>
Subject: Re: [#9951551031] Your Request to Google
Date: April 3, 2012 6:48:50 PM HST
To: editor@medicalveritas.org

Hello,

Thanks for reaching out to us.

We have received your DMCA complaint dated 3/29/12. At this time, Google has decided not to take action based on our policies concerning content removal. As always, we encourage you to resolve any disputes directly with the blogger in question.

Regards,

The Google Team


Original Message Follows:
------------------------
From: editor@medicalveritas.org
Subject: Your Request to Google
Date: Thu, 29 Mar 2012 23:44:13 +0000


247. By unfairly and deceptive restraining the Plaintiff's online businesses, consumers are and will continue to be deprived of beneficial and life-saving health products and services, alternatives to drugs and vaccines that millions of citizens cannot take safely due to pre-existing medical conditions such as allergies, immune-deficiency disorders, or auto-immune diseases.

248. By unfairly and deceptively restraining the Plaintiff's public education, consumer advocacy, and online whistleblowing, citizens and consumers will continue to be placed at greater risk of diseases and death caused by such censoring, or lacking information, or substantial exposure to false and misleading

67

information published by the Defendants' agents and enterprise.

249. Paragraphs 49; 72-79; and 84-111 identify the Defendants' agents and agencies liable for committing the aforementioned-acts of unfair competition in restraint of the Plaintiff's trade.

250. Absent injunctive relief by this Court, Defendants are likely to continue to defraud and injure consumers, reap unjust enrichment, harm the public's interest, and also damage, dominate, and destroy the Plaintiff's commerce, including the Plaintiff's OxySilver$^{TM}$ sales of value to consumers, healthcare professionals, free-and-fair trade, public health and safety, especially for medically-compromised persons who cannot, or should not, get vaccinated or take contraindicated anti-biotics.

## COUNT V

### Tortious Interference with Prospective Business Advantage

251. Plaintiff realleges and incorporates the allegations of Paragraphs 1 through 38 (identifying those interfering), and 81 through 102 (detailing interferences) as though fully set forth herein, and sues Defendants as an "enterprise" for tortuously interfering with Plaintiffs' free and fair trade, and prospective economic advantage.

252. Plaintiff HOROWITZ derives his income from royalties paid from the sale of his books and audiovisual products, and grants Medical Veritas International, Inc.—a California 501(c) non-profit educational service provider all profits made from the sale of his OxySilver$^{TM}$ and other health products and equipment he brought to market during public and professional education lectures and conferences, and through a number of online websites advertising his products.

68

253. Plaintiff's main customers are those looking for alternatives to risky drugs and vaccines.

254. Over the years, Plaintiff developed an actual prospective economic relationship with internet users that search for Plaintiff and his products on search engines.

255. Defendant SCHEIN is aware of the existence of Plaintiff's prospective economic relationship with professional audiences and internet users who desire to purchase HOROWITZ's products as Defendant SCHEIN contracted with Plaintiff to sell his books, audio education programs, and behavioral therapy packages online through SCHEIN's website.

256. Defendant HOROWITZ believed he had a good personal and professional relationship with SCHEIN's top officials, CEO Stanley Bergman, and President Jimmy Breslawski before these officials terminated the Defendant's contract.

257. Defendant HEARST too is aware of the existence of Plaintiff's prospective economic relationship with consumers and internet users who desire to purchase HOROWITZ's products as Defendant HEARST published details about some of these products, including OxySilver$^{TM}$, and the Plaintiff's "528 frequency" intellectual property and 'industrial property,' when HEARST's agents published two articles smearing the Plaintiff to damage his reputation, and thereby gain their company profit and their pharmaceutical enterprise's competitive advantage as well as the allopathic industry's security against HOROWITZ's challenge.

258. Paragraphs 81 through 102 detail Defendants HEARST and SCHEIN's drug and vaccine enterprise affiliates and interrelated agents commissioned to protect the pharmaceutical industry's biochemical (allopathic) paradigm and vast profits. These agents work to prevent the Defendants' profits from being diluted by

individuals such as the Plaintiff. This enterprise considers HOROWITZ a risk to be 'neutralized' because he subscribes to alternative paradigms (e.g., homeopathic medicine, bio-acoustic technologies, phototherapies and/or 'electro-genetic' treatments that rely on a different "bio-energy" paradigm that competes against the Defendants' allopathic paradigm.)

259. Both Defendants SCHEIN and HEARST, as well as allied advocates for PFIZER and MODERNA, including Google, Facebook, the "fact-checkers' at Snopes.com and Poynter.com, et. al., all generally disagree with the Plaintiff/whistleblower's research and publishing activities.

260. HOROWITZ's potential customers are put off when they view false, negative, and misleading statements made by Defendants' privies (alleged propagandists), when prospective customers search the Internet using search engines such as Google and Yahoo, and, for instance, no longer view the Plaintiff's biography or presence on *Wikipedia* and Facebook. These major web services financed or influenced by the Defendants' stockholders and institutional investors have acted to erase HOROWITZ's celebrity and damage his commerce.

261. HOROWITZ had an actual prospective economic relationship with numerous consumers including "Interfered Customers."

262. As a direct or proximate result of HEARST's affiliate Clear Channel and iHeart Radio damaging the Plaintiff as stated in Paragraphs 75 thru 76, interfered customers stopped buying, or were discouraged from trying, HOROWITZ products.

263. Additionally, when HEARST subsequently published two disparaging articles on the Internet in 2016 and 2018, this discouraged consumers from

learning the truth about the benefits of the Plaintiff's "528 frequency" discoveries and promising industry.

264. OxySilver™ sales, along with other HOROWITZ product sales, substantially diminished proximal to HEARST's three-pronged attack against the Plaintiff's professional reputation, personal integrity, and media visibility.

265. Between 2009 and 2012, OxySilver™ sales dropped from more than $1 million annually to less than $200,000.00 resulting in lost prospective economic advantage of at least $800,000.00 annually, not including other HOROWITZ products similarly diminished.

266. Instead of HOROWITZ's corporate sponsors growing with new 528 technologies, they struggled and shrank as millions of consumers adopted the alternative frequency promoted by HEARST and its shady media affiliates (i.e., 432Hz).

267. Defendant HEARST's published statements included, but were not limited to, "While Len fussed with the projector, Sherri set out boxes of nutritional supplements and crystal pyramids for sale. Their flagship product, OxySilver, retailed for $49.40. It contained one listed ingredient: purified water, though its nutritional table also included 5 micrograms of colloidal silver."

268. That statement is false and misleading. It misrepresents by substantial omissions and misperceptions OxySilver™ and other products the Plaintiff sells.

269. Moreover, the OxySilver™ label and nutritional table does not now, nor ever did, state the product included "5 micrograms of colloidal silver." This is a false, misleading, and disparaging statement; under the circumstances derogatory and damaging.

270. HEARST's May 13, 2018 article, published by Alan Cross through Global News, compounded the tortious interference and damage when Cross published a red-herring diversion rather than addressing the substance of HOROWITZ's 528 frequency discoveries. Cross concealed the fact that this precise frequency is believed to be of substantial importance to the religious world and medical science.

271. Cross's article promoted and linked to publications that directly compete against HOROWITZ's 528 industry. Cross's slur began, "Gather 'round kids. Those of you with tinfoil hats may wish to ensure that they're fitted snuggly. . ."

272. To divert from and misrepresent HOROWITZ's works in this field of musicology and acoustic therapy, Cross falsely stated, "Songs tuned to 440Hz work on the third eye chakra (the 'thinking') while 432Hz [the frequency Cross preferred and promoted] stimulates the heart chakra . . ." That is false, according to substantial science and clinical practices reviewed and published by HOROWITZ.

273. Cross's false statement tortuously diluted and obfuscated the key claim HOROWITZ makes regarding the "528 frequency"—that it is the "key of the house of David" (Isaiah 22:22; Rev. 3:6-8); the "good vibration" of "heart-felt loving intention in faithful prayer" that science has proven hastens recoveries. This knowledge prompted the "528 industry," including many safe and effective therapies. Contrary to Cross's false advertising of 432Hz energizing the "heart chakra," 528Hz is predominantly the "heart chakra" energy, HOROWITZ concluded and promoted for good cause based on substantial scientific evidence.

274. Contrary to HEARST's false and demeaning publication promoting 432Hz, 528Hz is the 'generally accepted' heart of the original musical scale; the 'key of C' when instruments and voices are tuned to A=444Hz, not 432Hz as HEARST falsely, intentionally, and disparagingly published.

275. Thereby, Defendant HEARST knowingly and intentionally influenced Internet users not to purchase HOROWITZ's products that feature 528Hz resonance, including "OxySilver$^{TM}$ with 528," because it is allegedly "tinfoil hat" foolishness.

276. Interfered Customers have refused to order from HOROWITZ's online stores as a direct or proximate result of Defendant HEARST's intentional interference with said relationships, via HEARST's negative publications demeaning HOROWITZ, misrepresenting his products, and smearing both.

277. The Interfered Customers indicated their willingness to purchase music and musical therapy products in the 'competing' frequency of 432Hz recommended by Cross/HEARST rather than buy products from HOROWITZ resonating in 528Hz.

278. Cross/HEARST/Global News also sold health products to Interfered Customers. The offending HEARST web page solicited sales of other products, including antimicrobial air cleaners branded "NatureFresh Purifiers."

279. These HEARST advertisements sold products in direct competition with HOROWITZ products such as "The Aranizer," a competing air freshener that HOROWITZ endorsed, sold, and advertised on various Internet websites.

280. Defendant HEARST was not authorized to sell competing products at the expense of the Plaintiff's good reputation and fair trade; nor does this company have any legal right to claim privilege for the actions of its employees, agents, or affiliates who wrote and published these allegedly defamatory and infringing articles.

281. As a direct and proximate cause of Defendant HEARST's negative postings, iHeart Radio interview censoring, and alleged defaming and 'hacking' of HOROWITZ's "528Radio.com" musical broadcasting service, individuals have

73

been discouraged or precluded from purchasing the Plaintiff's products. Many who did purchase stopped buying. 528Radio.com subscriptions were likewise compromised.

282. As a direct and proximate cause of the Defendant HEARST's intentional and unjustified tortious interference, HOROWITZ (his affiliated stores and 528Radio.com) has (have) suffered non-monetary and monetary damages of more than $800,000.00 annually from 2012 to the present.

283. WHEREFORE, Plaintiff HOROWITZ respectfully requests that this Honorable Court declare that Defendant HEARST (and its agents and affiliated companies) has (have) intentionally disrupted/interfered with Plaintiff's prospective economic relationships and business advantage.

284. Plaintiff further requests that the Honorable Court grant temporary and permanent injunctive relief against the violating conduct.

285. HOROWITZ also prays for the Court to award an amount to compensate the Plaintiff for his monetary damages, interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this Court deems just and proper.

## COUNT VI
### Civil Conspiracy[9] to Gain Unjust Enrichment

---

[9] Under Florida law, "[t]he elements of a civil conspiracy are: (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy." *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA2006). Generally, an actionable tort or wrong is required. Alternatively, a claim of civil conspiracy may be established if plaintiff "can show some 'peculiar power of coercion' possessed by the conspirators by virtue of their combination, which an individual acting alone does not possess." Walters, 931 So. 2d at 140

286. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 149 above, and further alleges:

287. Defendants conspired with one another, as well as other individuals and entities known and unknown, to perpetrate unlawful acts upon Plaintiff and society, or to perpetrate lawful acts by unlawful means, to wit: Defendants committed unfair and deceptive trade by issuing deceptive advertisements and falsified science, including vaccine trial reports rife with omissions and misrepresentations, to falsely induce reliance pursuant to claims of COVID-19 vaccine "safety" and/or "efficacy."

288. Defendants conspired with a series of scammers, including but not limited to media influencers Google, Facebook, MSNBC, NBC, ABC News, CNN, the McChrystal Group, the Poynter Institute, and others known and unknown in the medical and public health communities, to mislead citizens, especially those with pre-existing medical conditions at higher risk of vaccine injuries, to blindly accept getting vaccinated with vaccines risking genetic alterations that may turn deadly and result in more pandemics as time passes.

289. These co-conspirators and scammers output false and misleading advertising claiming safety and efficacy of trial mRNA "vaccines" that are not actually "vaccines" in the traditional sense or meaning of the term.

290. These co-conspirators and scammers fraudulently concealed in their advertisements that PFIZER and MODERNA classified their "vaccines" as "genetic therapies," yet claim they do not alter DNA, simply DNA's modulation and regulation of antigen and antibody production.

291.  These co-conspirators and scammers included government agents and

agencies, such as Dr. Anthony Fauci, the NIH, and politicians too that established the goal of gaining herd immunity by vaccination rather than by natural infection, or 'natural selection';  persuading officials nonetheless to shut down commerce and social gatherings, and impose "mask wearing," until the "vaccines" would be available—a form of extortion that resulted in devastating consequences to people's mental health, skyrocketing rates of suicide, domestic violence, psyscho-social disorders and civil unrest.

292. In other words, the co-conspirators and scammers induced health officials and the public to react to COVID-19 to their own detriment and damage, presumably for unjust enrichment.

293. The Defendants and complicit scammers increased the 'peculiar power of coercion' by virtue of their combination, which each individual Defendant acting alone did not possess.

294. The Defendants, complicit scammers, and allied insiders in government and media hid their pecuniary interests, falsely attributed the origin of COVID-19 to "nature," concealed substantial scientific evidence proving by the preponderance of evidence that the virus sourced from a lab, further evidenced by the discovery of genes from the AIDS virus in the SARS-coronavirus spike protein.

295. The Defendants, complicit scammers, and allied insiders in government with conflicting interests concealed the attachment "spike protein" peculiarly resembling HIV-1, enabling "advanced function" transmission and rapid transmissibility justifying the medical and public health emergency.

296. The Defendants, complicit scammers, and allied insiders in government with conflicting interests unfairly and deceptively concealed readily available tried, true, and affordable preventatives, including the entire class of anti-oxidants and

scientifically-proven phototherapies, to rely exclusively on costly and risky "vaccines."

297. The Defendants, complicit scammers, and allied insiders in government thereby discouraged consumers and government officials from relying on competing products, such as the anti-oxidants hydroxychloroquine and the Plaintiff's OxySilver™.

298. The aforementioned overt acts damaged the Plaintiff and society.

299. The Defendants, complicit scammers, and allied insiders in government caused massive economic hardship, huge increases in government spending, and social impositions falsely claimed and widely promoted to presumably secure citizens against the risk of the COVID-19 disease and death.

300. The Defendants and co-conspirators put their own pecuniary interests ahead of the health, welfare, and economic safety and security of victims of the conspiracy, including the Plaintiff/whistleblower whose preventative labors, writings, videos and films the Defendants smeared, concealed, or recklessly neglected.

301. Upon information and belief, Defendants -- by and through their complicit scammers, including officials in the U.S. Government -- had actual or constructive knowledge of the laboratory source of the COVID-19 virus and its planned or anticipated release.

302. This evidence of conspiracy can be known by viewing the video presentation Dr. Anthony Fauci gave to Georgetown University colleagues in January 2017 stating the incoming Trump Administration would be damaged by a severe unprecedented plague.

303. This actual or constructive knowledge of the man-made COVID-19 plague can also be known by viewing the "Event 201" coronavirus predictive "exercise" completed six weeks before the "Wuhan outbreak."

304. The aforementioned video presentations prove that the Defendants were keenly aware that their employees were playing a vital role in the onset of, and publicity surrounding, the pandemic; as well as the financially rewarding expansion of the "COVID-19 Emergency" (i.e., imposition) impacting on the global economy.

305. As a direct and proximate result of Defendants' participation in, and furtherance of, the conspiracy, the Plaintiff, society, and state and federal governments, suffered severe irreparable harm, and devastating damage.

## THE COURT'S POWER TO GRANT RELIEF

306. The FDUTPA and FTC Act (Stat. § 501.202 and 15 U.S.C. § 52, respectively) empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.

307. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

308. WHEREFORE, Plaintiff requests entry of a judgment against Defendants SCHEIN, HEARST, PFIZER, and MODERNA companies, enjoining them from continuing their conspiracy gaining them unjust enrichment by defrauding the public; granting the Plaintiff also compensation for his damages in an amount

within the jurisdictional limits of this court, including an award of interest, attorneys' fees, and costs as authorized by 42 USC §§ 1981(3) and 1988(b).

## COUNT VII
### RETALIATORY PERSONNEL ACTION (448.102(3))

309. Plaintiff realleges and incorporates the allegations of Paragraphs 1 through 23; 40 through 53, and 54 through 64, as though fully set forth herein, suing SCHEIN and the co-Defendants comparatively liable for "retaliatory personal action" under Florida law.

310. The Plaintiff was employed by SCHEIN between 1989 and 1993 as a chief corporate advisor, business consultant, and continuing professional education provider, author, publisher, and products vendor.

311. In 1993, SCHEIN fired the Plaintiff (i.e., took retaliatory personal action against an employee) because HOROWITZ objected to federal investigators concealing evidence that would have solved the "mystery" of the "Florida Dental AIDS Tragedy."

312. In addition, HOROWITZ refused to participate in SCHEIN's professional education activity, policy, or practice of selling infection control products and personal protective equipment unethically, based on officials concealing evidence in their investigation of the Florida AIDS virus transmissions; the concealment of which (i.e., evidence tampering) caused SCHEIN's sales to soar at the expense of healthcare professionals and consumers.

313. In mid-January 2020, the Plaintiff/whistleblower realized that SCHEIN was at it again, this time with the co-Defendants as well as government officials

concealing vitally important information about the origin of COVID-19, fanning infection fears, and SCHEIN product sales.

314. Moreover, HOROWITZ observed that beneficial available alternatives to COVID-19 drugs and vaccines were being recklessly neglected, even suppressed, in favor of unjust enrichment through SCHEIN and allied vendors' sales.

315. Exploiting public fears, just like the Plaintiff witnessed Defendant SCHEIN doing between 1990 and 1993, evidenced a continuing 'pattern-and-practice' of unlawful activity committed by SCHEIN in conspiracy with the co-Defendants.

316. These discoveries prompted the Plaintiff to notify federal officials (to no avail), and file this Complaint.

317.  Plaintiff prays for injunctive relief and damages to prevent the public and state and federal governments from being additionally defrauded and damaged.

## THE COURT'S POWER TO GRANT RELIEF

318. The Court, in its discretion to award injunctive relief, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid by the federal government for questionably safe (presumably unsafe) and questionably effective COVID-19 vaccines, and the disgorgement of ill-gotten monies, to prevent and remedy violations of the law.

## COUNT VIII

## INJUNCTIVE RELIEF

319. Plaintiff realleges and incorporates the allegations of Paragraphs 1 through 178, as though fully set forth herein, suing for injunctive relief from the aforementioned alleged torts.

320. Plaintiff owns and operates online health stores serving consumers, and has done so at all times relevant to this action.

321. Plaintiff relies on the Internet and his publications for his livelihood.

322. Plaintiff's career in public health requires his duty to protect citizens and consumers from health scams and scamsters. This helps save lives, secure people's health, and in return financially sustains the Plaintiff, his family, and business associates.

323. Plaintiff is also a Levitical priest who recognizes the religious implications of forced vaccinations and lockdowns violating Constitutional freedoms of religious assembly and Bible laws requiring blood purity for the protection of genetic integrity.

324. The Plaintiff lost his mother from a vaccine injury in 1990 while Plaintiff was employed by Defendant SCHEIN. The death of Plaintiff's mother occurred largely because the Swine Flu vaccine she took had hidden consequences. It proved deadly years later.

325. At that time, 1990, the Plaintiff was assigned by SCHEIN to investigate HIV/AIDS, and Plaintiff subsequently discovered evidence proving that HIV/AIDS sourced most likely from another tainted vaccine (i.e., the hepatitis B

vaccine developed to purportedly prevent or cure liver cancer).

326. Once Plaintiff began alerting citizens and health professionals to his research on the alleged origin and vaccine transmission of HIV/AIDS the Defendants' agents and privies-in-interest began an online and off-line campaign to defame him, censor him, smear his reputation, and damage his livelihood.

327. Plaintiffs' subsequent research into HIV/AIDS and the "vaccine pipeline" disclosed COVID-19 transmits similarly to HIV/AIDS using the same (or genetically similar) "spike protein," leading the Plaintiff to alert government officials and the public regarding little known or concealed risks to citizens' health and safety from the Defendants' vaccine enterprise that publishes false claims of safety and efficacy.

328. It is unconscionable to allow the Defendants to continue unlawfully advertising, selling, or administering their mRNA COVID-19 vaccines without gaining proper 'informed consent.'

329. It is unconscionable to permit vast expenditures of taxpayer money to pay for pre-orders of "genetic therapy" that have been falsely and deceptively advertised by the Defendants or their agents as "vaccines" adequately tested for safety and efficacy.

330. It is unconscionable to permit the U.S. Food and Drug Administration's (FDA) certification of Defendants' "vaccines" for safety when FDA simply relies on Defendants' limited trial protocol that neglected any and all genetic analyses for these "vaccines" that are more accurately designated by the Defendants as "genetic therapies," and known to alter or modulate DNA function through mRNA transcription.

331. It is also unconscionable to permit known environmental risks, including risks

to civilization and other species from viral mutations and 'reassortments' from mass inoculations spreading "novel" gene sequences presumed acceptable without adequately researching safety and considering the long-term consequences.

332. Accordingly, the public interest and government investment would be best served by entering an injunction against the Defendants.

333. The injunction should require Defendants to cease and desist any and all censorship of the Plaintiff's good faith reasonably-analyzed scientific research published on the Internet in video productions, articles, and books; precluding further deprivation of equal rights to free speech in public forums, including the Defendants privies-in-interest at Google.com, YouTube, Vimeo.com, Facebook, and *Wikipedia*.

334.  The injunction should require Defendants to cease and desist disparaging and defaming the Plaintiff/whistleblower on the aforementioned forums and elsewhere.

335. The injunction should require Defendants to supplement their COVID-19 "vaccine trial" protocols to assess the risks of genetic alterations or induced modulation of DNA to "genetic therapy" recipients and society.

336. The injunction should require Defendants to supplement their COVID-19 "vaccine trial" protocols to assess the risks of genetic reassortments of latent DNA and RNA tumor viruses in medically or immune compromised people.

337. The injunction should require the federal government to suspend its acquisition of the Defendants' COVID-19 vaccines until such a time as the aforementioned safety concerns are studied and resolved by supplemental trial(s), and the results of which are candidly made public.

338. Given the Plaintiff's pleadings, evidence, and affidavit alleging deceptive trade by the Defendants, this Court, while deciding to enjoin the Defendants and federal officials or not, must consider the COVID-19 emergency circumstances and rule in a manner most likely to prevent "substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. Sec. 45(n)

339. Should the Court find good cause to enjoin the Defendants and government as urged by the Plaintiff, the Court might consider ordering the Defendants to administer a public education campaign at their cost supplementing ongoing publications explaining to citizens the role of natural, readily-available, anti-oxidants scientifically-determined to boost immunity nutritionally using available sources of Vitamin C, D, Zinc and chlorophyll, and lifestyles that increase oxygenation as a preventatives against COVID-19 and other infectious diseases including some cancers.

340. The Defendants' burden in providing such a public service would be "outweighed by countervailing benefits to consumers [and] to competition."


## VII. PRAYER FOR RELIEF


WHEREFORE, Plaintiff LEONARD G. HOROWITZ, acting as a private citizen as authorized by Congress per 42 U.S.C. § 1988; pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); Stat. § 448.102(3) of the Florida Whistleblowers' Act; and the Court's own equitable powers, requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act by Defendants as enumerated in Claim VIII;

B. Award such relief, damages or compensation for losses, as the Court finds necessary to prevent injuries and deaths, or redress injury to consumers and Plaintiff resulting from Defendants' violations of the FTC Act and civil conspiracy law, tortious interference, and retaliatory personnel action, including, but not limited to, restitution, rescission or reformation of state and federal contracts as the Court deems justified, the refund of monies paid if or when appropriate, and the disgorgement of ill-gotten monies.

C. Award Plaintiff the fees and costs of bringing this action as authorized by 42 U.S.C. § 1988(b); as well as such other and additional relief as the Court may determine to be just and proper.


Respectfully submitted,


DATED: December 1, 2020




LEONARD G. HOROWITZ, pro se