AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### District of Massachusetts

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| CHARLES LIEBER | ) | Case No. |
| | ) | 20-mj-2158-MBB |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __April 28, 2018 & January 10, 2019__ in the county of __Middlesex__ in the

_____ District of __Massachusetts__ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1001(a)(2) | Making false statements to the agency of the United States Government |

This criminal complaint is based on these facts:

See attached affidavit of FBI Special Agent Robert Plumb.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Robert Plumb, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __01/27/2020__

_____
*Judge's signature*

City and state: _____ Boston, MA _____

Hon. Marianne B. Bowler
*Printed name and title*

**EXHIBIT 17**

## <u>AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT</u>

I, Robert Plumb, being sworn, depose and state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since June 2016. I am currently assigned to one of the FBI's Counterintelligence Squads in the Boston Field Office. My responsibilities include investigating violations of federal criminal laws relating to espionage and theft of trade secrets, the mishandling of classified and defense information, and export control laws. Previously, I was employed at the FBI as an Intelligence Analyst. I worked in this capacity for six years. I have participated in numerous investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, executed search warrants, and used other investigative techniques to secure relevant information regarding various federal crimes.

2.      I submit this affidavit in support of a Criminal Complaint charging Dr. Charles Lieber ("LIEBER") with making materially false, fictitious and fraudulent statements in a matter within the jurisdiction of the Executive Branch of the United States, in violation of Title 18, United States Code, Section 1001(a)(2). Specifically, based upon the evidence gathered thus far in this ongoing investigation, I have probable cause to believe and do, in fact, believe that LIEBER made materially false, fictitious and fraudulent statements regarding his participation in China's Thousand Talents Plan to the U.S. Department of Defense ("DoD") on or about April 24, 2018. I also have probable cause to believe and do, in fact, believe that, on or about January 10, 2019, LIEBER made and caused to be made a series of materially false, fictitious and fraudulent statements to the National Institutes of Health ("NIH") about his involvement in the Thousand Talents Plan and his affiliation with Wuhan University of Technology ("WUT") in China.

3.     Based on the evidence gathered to date, LIEBER was a "Strategic Scientist" at WUT and a contractual participant in China's Thousand Talents Plan for significant periods between at least 2012 and 2017. The terms of LIEBER's Thousand Talents contract called for LIEBER to be paid up to $50,000 per month in salary and approximately $150,000 per year for living and personal expenses by WUT. LIEBER was also awarded more than $1.5 million by WUT and the Chinese government to establish a research lab and conduct research at WUT.

4.     The information in this affidavit is based upon my training and experience, my personal knowledge of this investigation, information conveyed to me by other law enforcement agents and officials who assisted in the investigation, and the other sources of information described herein. This affidavit is submitted for the limited purpose of establishing probable cause to believe that LIEBER has committed the offenses described above. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation. I have set forth only those facts that I believe are necessary to establish the requisite probable cause.

## FACTS SUPPORTING PROBABLE CAUSE

### Background

5.     LIEBER is a full-time faculty member and Chair of the Department of Chemistry and Chemical Biology at Harvard University in Cambridge, Massachusetts. He has been affiliated with Harvard since approximately 1991. According to LIEBER's biography on Harvard's website, LIEBER's primary area of expertise and research is nanoscience.

6.     At all times relevant to this complaint, LIEBER served as the Principal Investigator of the Lieber Research Group at Harvard University. According to its website, the Lieber Research Group "is focused broadly on science and technology at the nanoscale, using novel synthesized

2

building blocks to push scientific boundaries in diverse areas from biology/medicine to energy and computing." The Lieber Research Group's website identifies its principal sponsors as NIH and DoD, including the Office of Naval Research ("ONR") and the Air Force Office of Scientific Research ("AFOSR"). Based upon records maintained by NIH, DoD, and Harvard University, I know that the Lieber Research Group has received more than $15,000,000 in grant funding from NIH and DoD since 2008.

7.     A component of the United States Department of Health and Human Services, NIH is a government agency responsible for biomedical and public health research. The NIH conducts its own scientific research through an intramural research program, and also provides major biomedical research funding to non-NIH research facilities through an extramural research program. Many of the non-NIH research facilities that receive funding through NIH's extramural research program are colleges and universities, including Harvard University.

8.     In order to receive NIH funding, non-NIH research institutions must submit a detailed application describing, among other things: (a) the purpose and scope of the proposed research; (b) the amount of funding requested; and (c) how the funding will be used. Both during the application process and periodically after an award is made, the institution must also disclose to NIH all foreign collaboration and foreign sources of research support, including, but not limited to, research grants, cooperative agreements, contracts and/or institutional awards. Additionally, NIH requires research institutions to identify and disclose to NIH significant (typically greater than $5,000) financial conflicts of interest by investigators (that is, the person or persons responsible for the design, conducting the research, and publishing or reporting the research performed pursuant to the grant), including those related to funds received from a foreign institution of higher education or the government of another country. Although it is the research institution itself that

3

submits the grant application and all other grant-related disclosures to NIH, the individual investigator(s) must certify to the institution and NIH that the information contained in grant applications, post-award submissions and all other grant-related filings is accurate and complete, and also acknowledge that any false, fictitious or fraudulent statements or claims made to NIH may subject the investigator to criminal, civil and/or administrative penalties.

9.     WUT is a university located in Wuhan, China.  It is considered a top-tier Chinese university recognized for its studies of science and technology.

10.     The "Chinese Talent Programs" refer collectively to various plans designed by the Chinese Government to attract, recruit, and cultivate high-level scientific talent in furtherance of China's scientific development, economic prosperity, and national security.  Implemented in 2008, the "Thousand Talents Plan" is the most prominent Chinese talent recruitment plan designed by the Chinese Government to incentivize individuals engaged in research and development in the United States to transmit the knowledge and research they gain here to China in exchange for salaries, research funding, lab space, honorary titles, and other incentives.  The Thousand Talents Plan is designed to lure both Chinese overseas talent and foreign experts to bring their knowledge and experience to China.  The so-called "World Recruitment Plan of Renowned Experts in China" is part of the Thousand Talents Plan.  The Chinese Talent programs have rewarded individuals for stealing proprietary information and violating export controls.

### *Lieber's Affiliation with WUT and China's Thousand Talents Plan*

11.     According to records maintained by Harvard University, LIEBER traveled to WUT in mid-November 2011 ostensibly in order to participate in a Nano-Energy Materials Forum being hosted by WUT.  Just days before LIEBER's trip, a professor at WUT (hereafter the "WUT Professor") emailed LIEBER a "Contract for Strategic Scientist's Appointment" (hereafter the

4

"Strategic Scientist Agreement").   He also informed LIEBER that LIEBER had been recommended for the "The Recruitment Program of Global Experts," which I know to be part of China's Thousand Talents Plan. In subsequent communications on or about November 11, 2011, both LIEBER and the WUT Professor acknowledged that LIEBER would sign the Strategic Scientist Agreement at WUT on November 15, 2011.

   12.    According to the agreement, which was written in both Chinese and English, LIEBER was appointed as a Strategic Scientist at WUT for five years from on or about November 15, 2011, until on or about November 14, 2016.   LIEBER's objectives and tasks under the agreement were as follows:

> Article Two    Employment Objective and Tasks for Party B
> 1. Make strategic, visionary and creative research proposals to guide the advancement of disciplines or scientific research institutes to become first class disciplines or scientific research institutes in China or the world, especially in frontier areas.
> 2. Supervise young teachers or receive them as visiting scholars, guiding or co-guiding postgraduate students (including post-doctoral students), leading them to the international forefront of related fields, jointly publishing academic papers in top international journals (in the name of WUT, and WUT faculty or students as the first author) or publishing high-level academic monographs and guiding young teachers to win national awards or influential international academic awards.
> 3. Build up a Discipline Innovative Team, introducing and cultivating high-level talents to be as qualified as those of China's 1000 Young Talents Plan, Distinguished Professors of Chang Jiang Scholars and winners of National Science Fund for Distinguished Young Scholars.
> 4. Conduct national important (key) projects or international cooperation projects that meet China's national strategic development requirements or stand at the forefront of international science and technology research field.
> 5. Carry out international exchanges and cooperation, and host or jointly host prominent international academic conferences in the name of WUT.

   13.    According to the contract, WUT agreed to pay LIEBER $50,000 U.S. Dollars ("USD") per month, prorated according to LIEBER's "actual work time" at WUT.   WUT also

5

agreed to provide LIEBER with round-trip, business-class airfare to and from WUT. Finally, the agreement alluded to LIEBER's future involvement with China's Thousand Talents Plan, and allowed for seemingly greater monthly compensation to LIEBER in the future:

> 4. Once Party B gains a Chinese government-sponsored position through successful application for various Chinese talent-related projects, Party A shall adjust its payment terms to ensure that Party B enjoys more benefits on the principle of "taking the higher pay", but the same benefit terms will not be paid twice.

14.     LIEBER returned to Massachusetts from WUT on or about November 16, 2011. Two days later, in an email to the WUT Professor, LIEBER wrote, "I very much appreciate the effort that you put into making my visit a good one. I also agree that it would productive, and hope that we can push forward as per discussions to build up the joint laboratory to a truly world-level facility." Approximately one month later, on or about December 19, 2011, the WUT Professor emailed portions of a proposed website for the "WUT-Harvard Joint Nano Key Laboratory," which, according to the website, was established in 2009. The website prominently featured LIEBER's name, photograph and biographical information, and it identified him as the "Laboratory Director." In his email to LIEBER about the website, the WUT Professor noted that "the Chinese version [of the website] will be made after your approval for [sic] the English version."

15.     On or about April 5, 2012, approximately five months after executing the Strategic Scientist Agreement with WUT, the WUT Professor wrote an email to LIEBER informing him that he had been selected to participate in China's Thousand Talents Plan. At that time, LIEBER's selection entailed awards by WUT and the Chinese Government of approximately $158,000 USD in "personal benefits" and nearly $800,000 USD in "research funding." Specifically, the WUT Professor wrote,

> I am very happy to let you know that, in the **World** Recruitment
> Plan of **renowned** experts in China (also called as one thousand plan
> of foreign experts), you have been approved and awarded as invited
> strategic foreign expert by Chinese government because of your
> **world-leading** achievements, the **good collaboration basis**
> between you and WUT, and your great **contribution** to national
> academic exchange between China and USA.   You are provided
> with personal benefit of one million RMB (~158,800 USD), a
> research funding of 5 million RMB (~794,000 USD) for
> development of WUT-Harvard joint nano key lab and collaboration
> research  This plan is the highest plan/program for famous foreign
> scientists in Chinese scientific field and only 40 famous experts
> from the world were awarded.  (Emphasis original.)

16.     Nearly three months later, on or about June 27, 2012, the WUT Professor shared

with LIEBER a contract titled "Employment Contract of 'One Thousand Talent' High Level

Foreign Expert" between LIEBER and WUT (hereafter the "Thousand Talents Agreement").  The

WUT Professor asked for LIEBER's "ideas/comments/suggestions" within "one week when your

schedule allows (of course, the sooner the better)."  The first page of the agreement appeared as

follows:

7

## "千人计划" 高层次外国专家工作合同书
## EMPLOYMENT CONTRACT of
## "ONE THOUSAND TALENT" HIGH LEVEL FORTIGN EXPERT

聘任方：＿＿＿＿＿武汉理工大学＿＿＿＿＿（简称甲方）

受聘方 " 千人计划" 高层次外国专家、美国哈佛大学教授

Charles M. Lieber 博士（简称乙方）

Employer ( Party A ): Wuhan Univesity of Technology

Employee (Party B )." One Thousand Talent"  high level foreign expert, professor **Charles M Lieber** from Harvard University, USA.

为保证" 千人计划" 高层次外国专家项目的顺利实施，保障甲乙双方的合法权益，根据中华人民共和国的有关文件精神和政策规定，经双方平等协商，订立本合同。

Both sides, in line with the principles of legality, fairness, equality, and mutual agreement, to ensure the implementation of "One Thousand Talent" high level foreign expert plan, and to guarantee the legal rights and obligations of both sides, on the basis of Chinese laws and rules concerned, agree to sign this contract.

第一条　聘期

" 千人计划" 高层次外国专家岗位首次聘期为三年， 该合同自签订之日起生效。聘任期满，经双方协商后，报上级主管部门审批，可续签下一期合同。

1. Duration of the Contract

The term of this contract will be 3 years since the date of signature. Both parties can sign the new contract through consultation and mutual consent after the contract is upon expiration with the permission of superior authorities department.

17.　　The Thousand Talents Agreement was effective for three years "from the date of signature." Among other things, the agreement obligated LIEBER to conduct scientific research; to "publish high-level articles in the renowned and important international academic journals in the name of Wuhan University of Technology;" to assemble a research team with "strong ability of [sic] research and innovation" in LIEBER's field of expertise; to "guide 1-2 distinguished young scholars and 3-4 doctoral students ... and help them publish systematic articles in the international

8

renowned journals;" to "organize 1-2 predominant influencing international conferences in his field in the name of Wuhan University of Technology;" and "invite 1-3 international top scientists to work in the lab as visiting scholars." The agreement also required LIEBER to work at or for WUT "not less than nine months a year" by "declaring international cooperation projects, cultivating young teachers and Ph.D. students, organizing international conference[s], applying for patents and publishing articles in the name of" WUT.

18.     In exchange for his work for and on behalf of WUT, WUT agreed to pay LIEBER $50,000 USD per month, and living expenses of up to 1,000,000 Chinese Yuan (based on 2012 exchange rates, approximately $158,000 USD) to be paid over the three-year term of the contract. The contract also allocated 11,000,000 Chinese Yuan (or roughly $1.74 million USD based on 2012 exchange rates) for the joint Harvard-WUT Nano Key Lab and related research. The following portion of the contract documented those financial terms. WUT is referred to as "Party A," while LIEBER is referred to as "Party B."

二、甲方义务

1．依法维护乙方应享有的各项权利。

2．为乙方提供良好的工作和生活条件

(1)办公及实验室条件：甲方按乙方的要求为乙方提供办公及实验条件。

(2)科研配套经费：聘期内，甲方为乙方提供 1000 万元科研配套经费（其中包括国家拨款 500 万元），主要用于购置实验仪器设备、科研新方向和基础设施建设；此经费由甲方管理，乙方与甲方的合作教授共同商量支配。

(3)团队建设条件：甲方按乙方的要求为乙方组建学术团队，并每年投入 100 万元团队建设经费，主要用于开支团队成员的工资、安家补贴，团队及乙方本人的差旅等；  此经费由甲方管理，乙方支配。

(4)生活条件：薪酬标准为每月 5 万美元（税前标准），按实际到岗时间支付；另享受 100 万元人民币的生活补贴（免税），分三年用支付。

(5)为乙方指导博士、博士后工作人员和高级访问学者等创造条件，人员由甲方推荐、乙方考察并最终确定。

3．为乙方提供完成本合同规定的工作目标及任务所需要的校内相关政策和支持。

2. Party A's Obligations

(1). Party A shall respect Party B's legal rights

(2). Party A shall provide Party B with necessary working and living conditions

a. working and lab conditions: Party A shall provide Party B with working and lab conditions according to Party B's requirement

b. scientific research funding: Party A shall provide Party B ten million Chinese Yuan (10,000,000 RMB) including five million RMB from national fund during the term of this contract to the construction of new direction and infrastructure construction, equipments and instruments purchasing. This amount of money shall be managed by Party A, and Party B can use it after discussing with the co-professor from Party A.

c. talent team construction condition: Party A shall construct talent team according to Party B's requirement and provide one million Chinese Yuan (1,000,000 RMB) as the funds of talent team construction each year. The funds shall be mainly used as the payment, accommodation, and travel expense of Party B and the team members. This amount of money shall be managed by Party A, and Party B can use it.

d. payment and living conditions: Party A shall provide Party B with fifty thousand U.S. Dollars ($ 50,000) per month (before tax), paid according to his working time in Wuhan University of Technology. Party A shall provide Party B with one million Chinese Yuan (1,000,000RMB) (after tax) as living allowance which will be paid 1/3 a year for three years.

19.     In a subsequent email to LIEBER dated July 10, 2012, the WUT Professor told LIEBER that WUT's president had signed the "1000 plan agreement" and that executed copies of the agreement had been mailed to LIEBER in Massachusetts for his signature.  In an email dated on or about July 21, 2012, the WUT Professor informed LIEBER that WUT had received copies of the Thousand Talents Agreement signed by LIEBER.

20.     After signing the Thousand Talents Agreement, LIEBER returned to WUT in November 2012.  LIEBER's travel expenses to and from Wuhan were paid by WUT.  Prior to this trip, arrangements were made to pay LIEBER his salary and living expenses as specified in the Thousand Talents Agreement.  For example, in an email dated on or about October 26, 2012, a WUT employee (hereafter the "WUT Employee") wrote to LIEBER:

> Before your visit, I would like to talk about one detail in the implementation of the contract of "one thousand talent" high level foreign expert between you and our university.  According to the article concerning the payment and living conditions, I want to know the way you prefer to be paid so that everything can be prepared before your coming.  I would like to provide two options for you to choose if you do not mind. Option one.  I help you open a new bank account in the Chinese Bank named [redacted].  The payment will be put into your account and you can get the payment from the branch of [redacted] in your country.  Option Two.  I can prepare the payment in cash.

21.     Less than three months later, on or about January 10, 2013, the WUT Professor emailed LIEBER an agreement titled "Academic Cooperative Agreement between Harvard University, USA and Wuhan University of Technology, P.R. China."  The stated purpose of the agreement, which had a five-year effective term, was to "carry out advanced research and development of nanowire-based lithium ion batteries with high performance for electric vehicles."  Apart from its stated objective, the agreement provided for a "cooperative research program" whereby researchers from WUT would "visit Department of Chemistry and Chemical Biology of

11

Harvard University for two months each year." Without consulting any Harvard officials, LIEBER signed the agreement on Harvard's behalf and returned the executed copies to the WUT Professor on or about January 11, 2013. I understand from conversations with Harvard's representatives that LIEBER did not have the authority to execute this contract on behalf of Harvard.

22.     One year later, LIEBER continued to work closely with — and continued to receive compensation from — WUT. For example, on or about January 18, 2014, LIEBER wrote to the WUT Professor and another person affiliated with WUT that he would accept a WUT graduate student (hereinafter the "Graduate Student") as a long-term "WUT-HU joint Ph.D. student" provided that WUT "support all of [the Graduate Student's] salary and research costs while working in my lab." In the same communication, LIEBER discussed an upcoming visit to WUT in February 2014, and he made specific demands regarding the payment of his salary:

> I would like to receive ~1/2 of salary (for the current period) in US dollars, with the remainder deposited into the bank account that was set-up. The ~00 that I promised to pay for the party following Lin Xu's Ph.D. defense in April, can be deduced from either 1/2.

23.     In June of 2014, LIEBER continued to discuss his compensation under the Thousand Talents Agreement with WUT. In an email to the WUT Employee dated June 16, 2014, LIEBER asked to maintain his bank account "the way it has been for now" and he reiterated his earlier request that half of his salary be deposited into his Chinese bank account and the other half be paid to him in cash when he next visited WUT. LIEBER further stated, "I think this is close to what [we] have done in [the] past."

24.     In late January 2015, LIEBER outlined his ongoing relationship with WUT, confirming that he intended to visit WUT "several" times per year or "perhaps slightly more in the next couple years as we try to build up the nano-bio part of the lab;" that he would be available for "electronic communication on a very regular basis with students (email, telephone, skype) so that

they obtain full input from me as an advisor;" and that "students visiting [from WUT] for periods at Harvard would have [the] same access as normal Harvard graduate students."

25.     Around the same time, independent of LIEBER, Harvard administrators learned for the first time of the WUT-Harvard Joint Nano Key Laboratory at WUT, including the fact that LIEBER was the director of the lab.  Harvard officials confronted LIEBER about the joint lab, and informed him that the improper use of Harvard's name and logo — orchestrated by LIEBER without Harvard's consent — violated University policy.  In response, LIEBER falsely told Harvard officials that he was involved in collaborative research with WUT for "mutual scientific interaction," but that WUT was using Harvard's name and logo without his knowledge or consent.

26.     On or about February 3, 2015, LIEBER emailed the WUT Professor and told him that WUT must cease using Harvard's name, stating, "Our agreement for research collaboration is between you/Wuhan University of Technology (WUT) and me, and **does not** constitute an agreement with Harvard University."  (Emphasis original.)  Subsequent emails suggest that LIEBER took additional steps to try and distance himself — at least publically — from WUT in the wake of Harvard's discovery of the joint Harvard-WUT nano lab.  These included cancelling a trip to WUT in June 2015 and advising a postdoctoral fellow at the Lieber Research Group to continue her work in LIEBER's lab *rather* than starting a position at WUT.

27.     Nevertheless, LIEBER's Thousand Talents Agreement and the earlier Strategic Scientist Agreement (which, according to their terms, expired in July 2015 and November 2016, respectively) appear to have remained in place well after January 2015.  For example, in an email dated February 13, 2015, LIEBER told the WUT Professor that he would continue his review of a manuscript written by WUT researchers.  In the same email, LIEBER also said that he "may be in touch with regards to several issues relating to my appointment/salary/funding @ WUT...."

13

Although it is unclear what precise "issues" LIEBER was referring to, at a minimum, this email shows that LIEBER continued to be paid by WUT after January 2015.

28.     In an email dated November 26, 2015, the WUT Professor thanked LIEBER "for all you have done for our university and me!" The WUT Professor also told LIEBER that WUT had "put your salary in your ... [bank] card and we will help you change the cash for you when you come to Wuhan." The fact that WUT continued to pay LIEBER's salary in late 2015 indicates to me that LIEBER, in fact, continued to work for, and with, WUT throughout 2015.

29.     The payment of salary to LIEBER by WUT appears to have continued into 2017. In an email dated January 17, 2017, the WUT Professor sent the following message to LIEBER:

> During our last meeting you mentioned the tour of Bejing in the end of Feb. or early March. President [of WUT]..., I· and all faculties and students in our Joint Nano Lab would like to invite you to visit WUT and our Joint Nano Lab. If your schedule is available, we would like to take this chance to express our everlasting gratitude to your great support for our university and me! Our university has put your salary in your ... [bank] card and we will help you change the cash for you when you come to Wuhan. Our university will cover your first-class flight ticket and accomadation [sic] like before. We would like to know your idea. With my best regards and thank you very much for your strong support again.

By this point, according to their express terms, LIEBER's Strategic Scientist and Thousand Talents Agreements with WUT had expired. Insofar as it discusses the payment of additional salary to LIEBER in January 2017, this email is evidence that LIEBER may have executed a new agreement with WUT at some point in either late 2016 or early 2017.

### Lieber's False Statements to DoD

30.     Since 2009, LIEBER has been the principal investigator associated with at least six research grants funded by various DoD entities, including ONR and AFOSR. The total value of

these grants exceeded $8 million.  As of April 2018, LIEBER was the principal investigator associated with three active DoD grants.

31.     On April 24, 2018, DoD investigators interviewed LIEBER about his active grants and whether LIEBER had appropriately disclosed foreign research collaboration to DoD.  During the interview, which took place at LIEBER's lab on the Harvard Campus, LIEBER said that he was familiar with China's Thousand Talent's Plan, but that he had never been asked to participate in the program.  Although LIEBER stated that he was never asked to participate in the Thousand Talents Program, he also told DoD investigators that he "wasn't sure" how China categorized him. I believe these statements were false because, as described above, WUT expressly asked LIEBER on numerous occasions in 2012 to participate in the Thousand Talents Program and to sign a Thousand Talents Agreement with WUT.   Moreover, based upon the email correspondence described above that I have reviewed, LIEBER *did* sign a three-year Thousand Talents Agreement with WUT on or about July 21, 2012, and was paid by WUT over the course of several years pursuant to that agreement.  The agreement that LIEBER signed was titled "Employment Contract of 'One Thousand Talent' High Level Foreign Expert" and it referred to LIEBER as a "One Thousand Talent."

32.     On April 26, 2018, two days after his interview with DoD, LIEBER emailed a research associate affiliated with the Lieber Research Group the following message:

> Can you also provide me with the link/info to CAS webpage where I am listed as directing (?) that lab at Wuhan?  I lost a lot of sleep worrying about all of these things last night and want to start taking steps to correct sooner than later.  I will be careful about what I discuss with Harvard University, and none of this will be shared with government investigators at this time.

I believe that "CAS" refers to the China Academy of Sciences, which I know to be a top Chinese research institute.  According to Harvard University's website, LIEBER was elected to the CAS

15

in December 2015.  At a minimum, this email demonstrates that LIEBER withheld information from "government investigators" about his relationship with WUT.  Given the timing of this email — two days after his interview with DoD — I believe LIEBER was referring specifically to the DoD investigators.

### Lieber's False Statements to NIH

33.     I am aware that LIEBER was the principal investigator associated with at least three NIH-funded research grants awarded to Harvard University since 2008.  The total value of those grants exceeded $10 million.  Two of those grants were being actively funded by NIH as of November 2018.

34.     On or about November 15, 2018, NIH inquired of Harvard about whether LIEBER and/or Harvard had failed to disclose LIEBER's then-suspected relationship with WUT and China's Thousand Talents Plan.  In order to respond to NIH's inquiry, Harvard interviewed LIEBER about his foreign affiliations generally, and any connection he might have to WUT in particular.  Based upon information provided by LIEBER during that interview, Harvard submitted a detailed written response to NIH on or about January 10, 2019.  I believe that LIEBER caused Harvard to make materially false and misleading statements about his connection to WUT and the Thousand Talents Plan in that written submission.

35.     Specifically, LIEBER caused Harvard to tell NIH that LIEBER "had no formal association with WUT" after 2012, but that "WUT continued to falsely exaggerate" LIEBER's involvement with WUT in subsequent years.  This statement was false because, as described above, LIEBER maintained a formal, collaborative relationship with WUT between at least 2012 and 2017 that included the Visiting Scientist Agreement, the Thousand Talents Agreement, an Academic Cooperative Agreement between Harvard and WUT, and possibly other agreements.

16

36.   LIEBER also caused Harvard to tell NIH that LIEBER "is not and has never been a participant in" China's Thousand Talents Plan.  This statement was also false because LIEBER did, in fact, sign a three-year Thousand Talents Agreement with WUT on or about July 21, 2012.

*CONCLUSION*

37.   Based on the forgoing facts, and on my experience, training and discussions with other individuals involved in this investigation, I believe that probable cause exists to conclude that on or about April 24, 2018, LIEBER knowingly and willfully made materially false, fictitious and fraudulent statements to DoD in violation of 18 U.S.C. § 1001(a)(2).  In addition, I believe that probable cause exists to conclude that on or about January 10, 2019, LIEBER made and caused to be made a series of materially false, fictitious and fraudulent statements to NIH, also in violation in 18 U.S.C. § 1001(a)(2).


_____
Robert Plumb
Special Agent, FBI


Sworn and subscribed before me this _____ day of January 2020.


_____
MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE


17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. |
| | ) | |
| | ) | Violations: |
| YANQING YE, | ) | |
| | ) | Count One: Visa Fraud |
| | ) | (18 U.S.C. § 1546) |
| Defendant | ) | |
| | ) | Count Two: Making False Statements |
| | ) | (18 U.S.C. § 1001(a)(2)) |
| | ) | |
| | ) | Count Three: Acting as an Agent of a |
| | ) | Foreign Government |
| | ) | (18 U.S.C. § 951) |
| | ) | |
| | ) | Count Four: Conspiracy |
| | ) | (18 U.S.C. § 371) |

INDICTMENT

At all times relevant to this indictment:

General Allegations

A.     The People's Republic of China and its Military

1.     The People's Republic of China ("PRC") is a "foreign government" as that term

is defined under 28 C.F.R. § 73.1(b).  The People's Liberation Army ("PLA") is the military arm

of the Chinese Communist Party ("CCP") and the armed forces of the PRC.  The PLA is

composed of six services and support forces: the PLA Army; PLA Navy; PLA Air Force; PLA

Rocket Force; PLA Strategic Support Force; and the PLA Joint Logistics Support Force.  The

Central Military Commission ("CMC") controls the PLA.  The PLA uses three schools (the

Academy of Military Science, National Defense University, and National University of Defense

Technology) to formulate military strategy, research and advance its military capabilities and

1

weapons systems, and train its armed forces. Professors at these schools also serve as military officers and leaders of the PLA.

2.     National University of Defense Technology ("NUDT") is a top military academy directed by China's CMC. It was founded in 1953 by the Harbin's Military Engineering Institute PLA. NUDT is involved in national defense research for the PLA and responsible for modernizing the PRC's armed forces and designing advanced weapons. NUDT is also responsible for training advanced scientific and engineering personnel, commanding personnel, and senior leadership in the PLA.

B.    The Defendant and Her Conspirators

3.     YANQING YE ("YE") is a Chinese national, a female member of the PLA, and member of the CCP. At all times relevant to the Indictment, YE was a Lieutenant in the PLA and was being directed by senior leaders of the PLA while conducting research at Boston University pursuant to a J-1 non-immigrant visa.

4.     Co-conspirator A was, at all relevant times, YE's supervisor as well as a Colonel in the PLA and full professor at NUDT.

5.     Co-conspirator B was, at all relevant times, an Assistant Professor in Management Science and Engineering at NUDT and a member of the PLA who according to YE had the rank "of less than Colonel." YE was aware that Co-conspirator B had worked on military research projects regarding rocket launchers.

6.     Co-conspirator C was, at all relevant times, an Assistant Professor in NUDT's College of Information Systems and Management.

2

C.    YE Fraudulently Gained Entry into the United States

7.    YE applied for, and obtained a, J-1 non-immigrant visa to conduct research in the

Department of Physics, Chemistry, and Biomedical Engineering, Center of Polymer Studies, at

Boston University.  YE's research and studies in the United States at Boston University were

funded by the Chinese Scholarship Council ("CSC").  The CSC was established in 1996 as a

non-profit institution affiliated with the PRC's Ministry of Education. The CSC is responsible for

the enrollment and administration of Chinese Government Scholarship programs and provides

funding for both undergraduate and graduate students, as well as post-doctoral visiting scholars,

to Chinese citizens wishing to study abroad and to foreign citizens wishing to study in China.

CSC is financed mainly by the state's special appropriations or scholarship programs.

8.    On or about August 4, 2017, YE electronically signed her visa application and

certified that all of her answers on the form were true and correct when, in fact, she

misrepresented her foreign military service to gain entry to the United States.  In her visa

application, YE described her foreign military service as follows:

> Name of Country/Region: CHINA
> Branch of Service: CIVIL SERVICE
> Rank/Position: STUDENT
> Military Specialty: NUDT [National University of Defense Technology]
> Date of Service
> From: 01 September 2009
> Date of Service
> To:  31 July 2017

This description was false as YE's foreign military service did not end on July 31, 2017, as she

represented to the U.S. Government.  Nor was her rank only that of a "student" in NUDT.  To

the contrary, YE was in fact a Lieutenant in the PLA and continued to work as a Lieutenant in

3

the PLA while studying and conducting research in the United States from in or about October 2017 to in or about April 2019. As described below, YE was tasked with numerous assignments from PLA officers while she was in the United States such as conducting research, assessing U.S. military websites, and sending U.S. documents and information to China, which YE completed by masking her affiliation to the PLA. YE also lied on her visa application when she answered "No" to the question: "Do you seek to engage in espionage, sabotage, export control violations, or any other illegal activity while in the United States?" Based upon YE's false representations, on or about September 5, 2017, the U.S. Department of State approved YE's DS-160 application. On or about October 14, 2017, YE gained entry into the United States using her visa that she knew had been procured through fraud and making false statements, in violation of 18 U.S.C. § 1546.

D.   YE Makes False Statements to U.S. Law Enforcement

9.   On or about April 20, 2019, officers of Customs and Border Protection along with a Special Agent of the FBI conducted an interview of YE at Boston Logan International Airport. During this interview, YE stated, among other things, that Co-conspirator A was her Chinese advisor and a "full professor" at NUDT and he held the military rank of "Colonel." YE falsely claimed that she had minimal contact with Co-conspirator A, and that Co-conspirator A did not provide much oversight of her research projects. She further falsely denied participating in any of Co-conspirator A's military projects. Yet, based upon records found on YE's electronic devices pursuant to a border search, at the instruction of Co-conspirator A, YE had accessed U.S. military websites, researched U.S. military projects, and compiled information for the PLA on two U.S. persons with expertise in robotics and computer science.

4

10.     During the April 20, 2019 interview, YE also denied having any involvement in Co-conspirator B's research.  YE described Co-conspirator B as an Assistant Professor of NUDT who held a military rank of "less than colonel."  She also claimed that she had no recent communications with him when, in fact, she had numerous WeChat conversations with Co-conspirator B in 2018 and 2019.  Indeed, according to a January 2019 WeChat conversation between YE and Co-conspirator B, they were collaborating on a research paper that was focused on a risk assessment model designed to assist the PLA in deciphering data for military applications.  On or about April 11, 2019, Co-conspirator B sent YE a message in Chinese that has been translated into English that states: "See if [we can] find projects in risk analysis and policy sponsored by the US military by searching risk + US military directly."  YE also provided Co-conspirator B her Boston University VPN login, including her username and password so Co-conspirator B could log into YE's account.

11.     Lastly, during this interview, YE stated that she held the rank of Lieutenant in the PLA and admitted she was a member of the CCP.  She planned to return to the PRC and complete her PhD at NUDT under the advisement of Co-conspirator A.  YE indicated that part of her undergraduate studies at NUDT included classification training and students at NUDT worked on classified projects.

E.     YE Acted as an Agent of the PRC without Notification to the Attorney General

12.     In direct violation of the terms of her J-1 visa, while in the United States, YE had extensive communications with several senior PLA officers and she continued to work as a PLA Lieutenant.  YE was tasked by senior PLA officers, completed those taskings, conducted research on the U.S. military for the PLA, collaborated with Co-conspirator B on research

projects that had potential military applications, and lied about her engagement with PLA

officers when directly questioned about them.  YE acted as an agent for the Chinese government,

yet she never notified the Attorney General as required for agents working for a foreign

government.

<u>COUNT ONE</u>
Visa Fraud
(18 U.S.C. § 1546(a))

The Grand Jury charges:

13.     The allegations contained in paragraphs 1-12 are hereby re-alleged and incorporated by reference as if fully set forth herein.

14.     The conduct alleged in this Count occurred outside the jurisdiction of any particular State or district and within the venue of the United States District Court for the District of Massachusetts, as provided in 18 U.S.C. § 3238.

15.     On or about August 4, 2017, in the People's Republic of China, the defendant

YANQING YE,

did knowingly subscribe as true, under penalty of perjury (28 U.S.C. § 1746), a false statement with respect to a material fact in an application, to wit, in response to the question: "Have you ever served in the military?" on the Form DS-160, Application for Immigrant Visa and Alien Registration, YE responded that she only had attained the rank of "student" at NUDT and her period of service to Chinese military ended on July 31, 2017, which statement the defendant then and there knew was false.

All in violation of Title 18, United States Code, Section 1546(a).

7

<u>COUNT TWO</u>
False Statements
(18 U.S.C. § 1001)

The Grand Jury further charges:

16.     The allegations contained in paragraphs 1-12 are hereby re-alleged and incorporated by reference as if fully set forth herein.

17.     On or about April 20, 2019, in the District of Massachusetts, the defendant

YANQING YE,

in a matter within the jurisdiction of the executive branch of the Government of the United States, did knowingly and willfully make a materially false, fictitious and fraudulent statement and representation, which YE then knew to be false during an interview conducted by CBP officers and a FBI Special Agent.

All in violation of Title 18, United States Code, Section 1001(a)(2).

8

<u>COUNT THREE</u>
Acting in the United States as an Illegal Agent of a Foreign Government
(18 U.S.C. § 951)

The Grand Jury further charges:

18.     The allegations contained in paragraphs 1-12 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

19.     Beginning on a date unknown to the Grand Jury, but no later than in or about

October 2017, and continuing until in or about April 2019, in the District of Massachusetts and

elsewhere,

YANQING YE,

defendant herein, did knowingly act in the United States as an agent of a foreign government, to

wit: the People's Republic of China, without prior notification to the Attorney General of the

United States as required by law.

All in violation of Title 18, United States Code, Section 951(a).

9

)

## COUNT FOUR
Conspiracy
(18 U.S.C. § 371)

The Grand Jury further charges:

20.     The allegations contained in paragraphs 1-12 are hereby re-alleged and incorporated by reference as if fully set forth herein.

21.     Beginning on a date unknown to the Grand Jury, but no later than in or about October 2017, and continuing until in or about April 2019, in the District of Massachusetts and elsewhere, the defendant

## YANQING YE,

did knowingly and willfully conspire with others known and unknown to the Grand Jury to commit an offense against the United States, to wit, 18 U.S.C. § 951, that is, to knowingly act in the United States as an agent of a foreign government, the PRC, without prior notification to the Attorney General as required by law, in violation of 18 U.S.C § 371.

## OVERT ACTS

21.     In furtherance of the conspiracy, and to effect its objects, the defendant and her co-conspirators committed overt acts, including but not limited to, the following:

a.     On or about August 4, 2017, YE lied on the Form DS-160, Application for Immigrant Visa and Alien Registration, about her military rank in the PLA, position in the PLA, and the end date of her service.  She made these statements to fraudulently obtain a J-1 visa so as to gain entry into the United States and operate within the United States under the direction and control of her senior leaders in the PLA.

10

b.       On or about March 15, 2018, YE sent instructions to Co-conspirator B in Chinese via WeChat on how to access Boston University's document database using her Boston University VPN login information (username and password) thereby giving Co-Conspirator B the ability to log into Boston University posing as YE.

c.       Beginning in or about January 2019, Co-conspirator B and YE collaborated on a research paper that was focused on a risk assessment model designed to assist in deciphering data for military applications.  As part of this research project, among other things,  on or about April 11, 2019, Co-conspirator B advised YE via WeChat: "See if [we can] find projects in risk analysis and policy research sponsored by the US military by searching risk + US military directly."  In response, later on April 11, 2019, YE responded via WeChat that she would conduct this research.

d.       On or about April 6, 2019, Co-conspirator A instructed YE via WeChat to research a U.S. professor at the Naval Postgraduate School at Monterey, California whose work focused on computer security, digital forensics, and computer and software engineering and prepare a summary of his biography for him.  Co-conspirator A advised Ye: "Compile the information into a file, then send it to me please."  YE responded: "Sure Teacher [Co-conspirator A].  Please go to bed now.  I will start to work on it immediately."  Approximately, six hours later, YE sent Co-conspirator A three documents: (1) a Word document that she prepared summarizing the professor's biography; (2) the professor's curriculum vitae from the school's website; and (3) a list of his published articles.

e.       On or about April 11, 2019, Co-conspirator C requested YE via WeChat to download a pdf file from a U.S. navy website –

**www.public.navy.mil/surfor/Documents/Surface_Forces_Strategy.pdf**. YE did as she was instructed and sent Co-Conspirator C this document via WeChat. In response, Co-conspirator C stated: "Now a days, we can't connect to a link with *mil* top level domain from China... This is probably American taking precautions against us." YE agreed with these statements and revealed that when she has been searching for information recently, "sometimes I have to use the IP of the university to enter certain websites."

      f.      On or about April 15, 2019, Co-conspirator A sent YE requests via WeChat to access the U.S. navy website – **www.onr.navy.mil** and "check if it has a list of projects." Later that same day, Co-conspirator A also requested YE to access the U.S. army website – **www.arl.army.mil** and review the contents of that website for him.

      g.      On or about April 16, 2019, Co-conspirator A instructed YE via WeChat to conduct research and compile information on a Professor of Electrical and Computer Engineering at University of Texas at San Antonio. This professor's research focused on system of systems technology and intelligent robotics. As instructed, YE compiled the information Co-conspirator A requested and sent it to Co-conspirator A via WeChat on or about April 16, 2019.

      All in violation of Title 18, United States Code, Section 371.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Criminal No. *2002/0015* |
| | ) |
| | ) Violations: |
| v. | ) |
| | ) Count One: Smuggling Goods From |
| ZAOSONG ZHENG, | ) the United States |
| | ) (18 U.S.C. § 554) |
| Defendant | ) |
| | ) Count Two: False Statements |
| | ) (18 U.S.C. § 1001(a)(2)) |

INDICTMENT

General Allegations:

A.    The Defendant

1.    ZAOSONG ZHENG ("ZHENG") is a Chinese national who entered the United

States through the J-1 non-immigrant visa program ("J-1") on or about August 8, 2018.

ZHENG's J-1 visa application was sponsored by Harvard University and granted by the State

Department on or about July 17, 2018.   While in the United States, ZHENG received a stipend

of approximately $2,000 per month from the Chinese Scholarship Council.   The Chinese

Scholarship Council ("CSC") was established in 1996 as a non-profit institution affiliated with

the PRC's Ministry of Education.   The CSC is responsible for the enrollment and administration

of Chinese Government Scholarship programs and provides funding for both undergraduate and

graduate students, as well as post-doctoral visiting scholars, to Chinese citizens wishing to study

abroad and to foreign citizens wishing to study in China.   CSC is financed mainly by the state's

special appropriations or scholarship programs.

2.    ZHENG obtained medical degrees while living in the People's Republic of China

1

("PRC").   From in or about August 2018, and continuing until in or about December 2019,

ZHENG conducted research in the area of biomedical sciences, specifically in cancer pathology,

at the Beth Israel Deaconess Medical Center ("BIDMC").

**B.**     <u>Beth Israel Deaconess Medical Center and Wenyi Wei Laboratory</u>

4.     BIDMC is a teaching hospital and medical research facility of Harvard Medical

School located in Boston, Massachusetts.   BIDMC has numerous laboratories, including the

Wenyi Wei laboratory.   The focus of the Wei Laboratory is the study of cancer cells.

**D.**     <u>ZHENG Smuggles Vials Containing Biological Research and Specimens</u>

5.     Between on or about September 4, 2018, and on or about December 9, 2019,

ZHENG worked at Wei's laboratory at BIDMC on cancer-cell research.

6.     On or about Monday, December 9, 2019, ZHENG went to Boston Logan

International Airport and attempted to leave the United States bound for Beijing, China on

Hainan Airlines (HU) flight 482 with vials of biological materials and research he had stolen

from Wei's laboratory.

7.     Before ZHENG boarded HU flight 482, Customs and Border Protection ("CBP")

officers located two checked bags in ZHENG's name and examined them.   They discovered 21

vials wrapped in plastic and hidden in a sock.   The vials were visually inspected and appeared to

contain liquid.   The officers suspected that the contents were biological in nature.   As indicated

below, the vials have been tested and analyzed and the results of this testing confirmed that the

vials contained Deoxyribonucleic Acid ("DNA"), and therefore constitute biological specimens.

Accordingly, ZHENG was required to package the vials in a heat sealed bag and label them with

the words "[s]cientific research specimens, 49 CFR 173.4b applies."   The vials were not

2

properly packaged or declared in accordance with U.S. transportation regulations.

8.      CBP officers identified ZHENG and approached him before he boarded HU flight 482.   CBP officers asked ZHENG multiple times if he was traveling with any biological items or research material in either his carry-on or checked luggage.   ZHENG replied "no."   ZHENG was then removed from the jetway and escorted to the baggage secondary area, where he acknowledged his ownership of the checked baggage containing the 21 vials.

E.      ZHENG Admits He Stole Biological Research from BIDMC

9.      On or about December 10, 2019, ZHENG returned to Logan Airport to board a flight destined for the PRC.   When ZHENG arrived at the airport, he was met by Special Agents of the Federal Bureau of Investigation.   With the aid of a Mandarin linguist, ZHENG was advised of his *Miranda* rights, which he waived, and was then interviewed.   ZHENG explained that he worked at a laboratory at BIDMC, conducting research related to cancer.   ZHENG admitted that he had stolen biological specimens from BIDMC and that he was planning to take the specimens to China so that he could conduct further research on the specimens in his own laboratory and publish the results under his own name.

10.      On or about December 10, 2019, the vials found in ZHENG's luggage were sent to a government laboratory for testing.   On or about January 17, 2020, the government received confirmation from the laboratory that the material in the vials contained DNA, and therefore constituted biological specimens for the purpose of Title 49, United State Code, Section 173.4b.

11.      49 C.F.R. § 173 sets forth the regulations for travel with hazardous materials.   49 C.F.R. § 173.4b regulates air travel with non-infectious biological specimens.   In relevant part, it provides that:

3

Non-infectious specimens, such as specimens of mammals, birds, amphibians, reptiles, fish, insects and other invertebrates . . . are not subject to the requirements of this subchapter[1] provided the following packaging, marking and documentation provisions, as applicable, are met:

(1) The specimens are . . .

(ii) Placed in vials or other rigid containers with no more than 30 mL of alcohol or alcohol solution. The containers are placed in a plastic bag that is heat-sealed;

(2) The bagged specimens are placed in another plastic bag with sufficient absorbent material to absorb the entire liquid contents inside the primary receptacle. The outer plastic bag is then heat-sealed . . . and

(5) The outer package must be legibly marked "Scientific research specimens, 49 CFR 173.4b applies."

<u>COUNT ONE</u>
Smuggling Goods From the United States
(18 U.S.C. § 554)

The Grand Jury charges:

12.     The allegations contained in paragraphs 1-11 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

13.     On or about December 9, 2019, in the District of Massachusetts, the defendant,

ZAOSONG ZHENG,

did fraudulently and knowingly export and send, and attempt to export and send, from the United

States, merchandise, articles, and objects, to wit: biological specimens, contrary to the laws and

regulations of the United States, specifically, 49 C.F.R. § 173.4b.

All in violation of Title 18, United States Code, Section 554.

---

[1]   Those requirements set forth further regulations that govern the transportation of hazardous materials including infectious biological specimens.

4

<u>COUNT TWO</u>
False Statements
(18 U.S.C. § 1001(a)(2))

The Grand Jury further charges:

14.     The allegations contained in paragraphs 1-11 are hereby re-alleged and incorporated by reference as if fully set forth herein.

15.     On or about December 9, 2019, in the District of Massachusetts, the defendant,

ZAOSONG ZHENG,

knowingly and willfully made a materially false, fictitious and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, that is, when asked by Customs and Border Protection officers whether he was traveling with any biological items or research material, he answered "no," when in fact he had hidden 21 vials containing biological specimens in his luggage.

All in violation of Title 18, United States Code, Section 1001(a)(2).

A TRUE BILL

FOREPERSON

BENJAMIN TOKOFF
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: January 21, 2020
Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

HAROLD G. PUTNAM
1.21.2020 @12:58pm

6